UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles A. ESSER,
Defendant-Appellant.

No. 74–1997.

United States Court of Appeals,
Seventh Circuit.

Argued May 19, 1975.

Decided Aug. 12, 1975.

Joel Murray, Robert J. Butler, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman, Guy P. Seaberg, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, BAUER, Circuit Judge, and EAST, Senior District Judge.*

BAUER, Circuit Judge.

Appellant-defendant, Dr. Charles Esser, a veterinarian, was indicted on three counts of willful evasion of income taxes for the years 1967, 1968 and 1969 in violation of 26 U.S.C. § 7201.[1]

## I. WERE *MIRANDA* WARNINGS REQUIRED AT THE OUTSET OF THE INVESTIGATION?

In the latter part of 1969, Philip M. Smith was an auditor in the Field Audit Division of the Internal Revenue Service. On August 26, 1969 he called Dr. Esser to arrange a meeting at his animal hospital on September 4, 1969 for the purpose of examining his books and records relative to a tax audit for the year 1967. At that meeting he examined appellant's books and records for the tax years 1967–1968 and observed that the total deposits in Dr. Esser's bank accounts exceeded his stated income for the years 1967 and 1968 by approximately $57,000 in 1967 and $34,000 in 1968. When questioned about the discrepancy, defendant could think of no explanation for the excess deposits.

Some time between September 4, 1969 and October 1, 1969 Smith obtained from Special Agent George Stearn of the Internal Revenue Service, Intelligence Division, a list of prepared questions which

he used in a subsequent interview of Dr. Esser on October 1, 1969. Although he had never used the form in a civil audit before, he was familiar with the nature of the questions which it contained and knew that the answers to those questions could bring to light any possible, reasonable explanation for the apparent discrepancies discovered on September 4. Smith stated that the information elicited from the use of the form could be utilized in a civil case, and noted that he would have asked most of the questions included in the questionnaire anyway, but employed it to make sure that he didn't forget anything. At the October 1 meeting Dr. Esser told Smith that he had on hand an amount of money acquired shooting dice in 1944 and 1945, but indicated that it was hidden, and its location would not be disclosed. Dr. Esser also stated at this time that the hidden amounts of money were not deposited in his bank accounts. At no time did Agent Smith advise defendant of his constitutional rights.

Smith first referred the case to the Intelligence Division on October 3, 1969, two days after the interview with Dr. Esser. He was not contacted by any member of the Intelligence Division of the Internal Revenue Service regarding a criminal tax fraud investigation of Dr. Esser at any time prior to that referral. He was first contacted by Special Agent Stewart J. Hoak of the Intelligence Division approximately two or three weeks after the initial referral.

■ Defendant claims that all evidence relating to Revenue Agent Smith's October 1, 1969 interview of defendant should be suppressed, because Smith did not give any *Miranda* warnings to defendant prior to that interview. That interview occurred prior to the referral

---

* The Honorable William G. East, Senior District Judge, District of Oregon, is sitting by designation.

1. 26 U.S.C. § 7201 states as follows:

"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payments thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,-000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

of defendant's case to the Intelligence Division. The trial court denied defendant's motion to suppress. In our opinion the district judge was correct.

Under this Court's decision in *United States v. Dickerson*, 413 F.2d 1111, 1117 (7th Cir. 1969), *Miranda* warnings are only required in noncustodial tax investigations "at the inception of the first contact with the taxpayer after the case has been transferred to the Intelligence Division." This was done in the instant case. The first contact with defendant after transfer of the case to the Intelligence Division was Special Agent Hoak's interview of defendant on November 21, 1969. At the inception of that interview, Hoak advised the defendant of his constitutional rights. Defendant does not challenge the sufficiency of these warnings.

Relying on a footnote in *United States v. Habig*, 413 F.2d 1108 (7th Cir. 1969) appellant suggests that since Agent Smith had some suspicion that a criminal fraud may have been involved he had for all purposes began the criminal investigation thus making *Miranda* warnings mandatory. We cannot agree since the record discloses no indication of unreasonable delay or collusion between Smith and any Intelligence Agent. Consequently the motion was properly denied.

## II. MUST THE GOVERNMENT PROVE THE EXACT DATE OF EACH OFFENSE ALLEGED IN THE INDICTMENT?

Count I of the indictment charged that on or about April 15, 1968, defendant willfully and knowingly attempted to evade income tax due for the year 1967, by filing a false income tax return. Count II of the indictment charged that on or about April 15, 1969, defendant wilfully and knowingly attempted to evade income tax due for the year 1968, by filing a false income tax return. Count III of the indictment charged that on or about April 15, 1970, defendant willfully and knowingly attempted to evade income taxes due for the year 1969, by filing a false income

tax return. Accordingly defendant argues that since the offense charged in each count of the instant indictment is committed at the time the return is filed, and since each count of the indictment specifically charges the date on or about which defendant filed each return, the government must at least prove that each offense charged was committed on or about a date in close proximity to the date charged in the indictment, and on or about a date before the indictment was returned and within the statute of limitations.

With regard to this claim the defendant stipulated that he had filed the returns, and that the Internal Revenue Service had received them. Each of the returns showed on its face that it was dated in April of the year following the tax year, and defendant identified the returns as having been signed by him on the dates indicated. In the absence of any evidence to the contrary, the trial court concluded that the jury could properly infer that the returns were filed on or about the dates charged.

## III. IN A BANK DEPOSITS THEORY CASE MUST THE GOVERNMENT INTRODUCE INTO EVIDENCE ALL OF DEFENDANT'S TRANSACTIONS IN THE DEPOSIT ACCOUNT?

Appellant argues that the trial court should have granted motions for judgment of acquittal based upon the government's failure to conduct a thorough examination and analysis of defendant's bank deposits. We do not accept appellant's argument and find that the trial judge had sufficient grounds for denial of the motion for acquittal.

I.R.S. Agent Hoak testified that deposit slips and underlying items of deposit are customarily introduced to demonstrate the nature of the deposits. However, in this instance it was virtually impossible to introduce the deposit slips due to their poor quality, unreliability, and unavailability. The government introduced the bank statements and pass books as the most reliable evidence avail-

able. Though appellant attempted on cross-examination to establish that the slips and items were capable of retrieval, the question was left as one of fact for the jury.

Defendant argues also that the bank deposits theory requires an analysis of the bank deposit items themselves. He contends that the government's duty to specifically identify and analyze the defendant's deposit slips and the underlying items is mandated by the "bank deposits cases"; and that failure to do so is fatal to the government's case. On examination the authorities reveal no such duty.

■ These cases establish that the bank deposits theory requires the government to prove that the defendant was engaged in an income producing business and that regular deposits of funds having the appearance of income were in fact made to bank accounts during the course of business. *United States v. Lacob*, 416 F.2d 756 (7th Cir. 1969); *United States v. Stein*, 437 F.2d 775 (7th Cir. 1971); *United States v. Morse*, 491 F.2d 149 (1st Cir. 1974). The total deposits figure serves as the starting point for further analysis of the taxpayer's accounts. The government must do everything that is reasonable and fair under the circumstances to identify any non-income transactions and deduct them from total deposits. Further, all proper deductions and credits must be subtracted. *United States v. Slutzky*, 487 F.2d 832 (2nd Cir. 1973). However, the government's investigators are not obliged to track down every conceivable lead offered by the taxpayer to justify the non-income designation of a particular item.

■ After the government proves that deposits having the appearance of income were made the defendant has the burden to explain as far as possible the deposits. With this done the jury is entitled to infer that the difference between the balance of deposited items and reported income constitutes unreported income.[2]

■ The record herein supports the conclusion that a full investigation of various transactions underlying defendant's deposits was conducted, and that all reasonable steps were taken to identify and deduct non-income items such as interbank transfers and repayment of loans. The evidence showed that defendant admitted to the agents that he deposited his business receipts into his bank accounts. Further, the bank statements introduced into evidence, particularly the statements from the business checking account, showed regular deposits having the appearance of business receipts. The record is replete with testimony regarding the determination and crediting of non-income items to the total deposits. In our opinion the evidence was more than sufficient to support the verdict below.

## IV. DID THE TRIAL COURT ERR IN PERMITTING THE TESTIMONY OF A SUMMARY WITNESS?

■ Appellant seeks to attack the testimony of the government's summary witness predicated on the argument

---

2. At trial, the government introduced evidence, primarily in the form of bank statements, that defendant made bank deposits of $125,448.44 in 1967, $125,716.85 in 1968, and $155,189.34 in 1969. Excluding all other sources for these deposits and giving defendant credit for all business expenses claimed, defendant's net business profits far exceeded the amount shown on his return:

| Year | Net Profits Per Government's Evidence | Net Profit Per Return |
|------|--------------------------------------|------------------------|
| 1967 | $48,092.22 | $ 6,873.28 |
| 1968 | $48,913.31 | $15,231.41 |
| 1969 | $56,817.40 | $34,595.43 |

The government also showed that substantial amounts of federal income tax were due on the unreported business profits.

The government explained in detail the method employed to analyze the defendant's bank deposits during the years in question. Total deposits were determined by examination of the defendant's bank statements. From that total, all interbank deposits, re-deposits of cash, proceeds of inheritance and gifts and all other non-taxable sources of income were deducted.

heretofore decided; that the deposits proof was insufficient. The nature of a summary witness' testimony requires that he draw conclusions from the evidence presented at trial. In the instant case the record shows that the summary witness relied only upon the evidence received during the trial and that he was available for full cross-examination. Consequently the evidence was properly admitted for the jury's consideration and the judge properly denied defendant's motion.

■ The use of a summary witness in a bank deposits case was recently reaffirmed by this Court in *United States v. Stein, supra.* Summary testimony does not allow the witness to invade the province of the jury as defendant argues. In *United States v. Doyle,* 234 F.2d 788 (7th Cir. 1965), the need for and validity of a summary testimony was upheld, so long as:

> "The sources from which the figures were obtained and the calculations prepared were in evidence [and the defendant could enjoy] ample opportunity to cross-examine the auditor fully as to all of those details and as to the evidentiary sources from whence they came" 234 F.2d at 794.

■ In short, the government proved by clear, reliable evidence that defendant had enormous bank deposits and that after deducting all non-income sources of deposits, the business receipts far exceeded the amounts shown on his income tax returns. This evidence was more than sufficient to support the jury verdict below.

V. DID THE GOVERNMENT PRESENT SUFFICIENT EVIDENCE TO SHOW THAT DEFENDANT WILLFULLY ENGAGED IN CRIMINAL CONDUCT?

Appellant's argument that the government failed to prove an essential part of the charge, i. e., willfulness, lacks merit. Admittedly there was no evidence in this case of the classic indicia of fraud, e. g., duplicate books and hidden accounts.

The government however did in our opinion present evidence sufficient to allow the jury to find that defendant engaged in a pattern of understating income for three consecutive years.

■ Willfulness may be inferred from conduct which would have the effect of misleading or concealing such as a continual pattern of under-reporting income. See *Spies v. United States,* 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1942); *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Bishop,* 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). Defendant argues that there must be some type of independent evidence, i. e., dual bookkeeping, secret accounts, testimony as to intent, to prove willfulness and that it cannot be inferred from the defendant's conduct. In general we agree that in almost every case there must be some independent evidence to corroborate the willful intent that is either inferred or shown by the defendant's actions. However, in a case such as this wherein the facts demonstrate a clear intent to mislead over a period of years, where the evidence is overwhelming, we think the jury could reasonably infer that the defendant's actions were willful.

VI. WAS THE GOVERNMENT'S SURVEY MATERIAL THAT TYPE WHICH MUST BE DISCLOSED UNDER BRADY V. MARYLAND?

Appellant's argument regarding the survey of defendant's customers can be broken down into three separate claims. The first is that governmental counsel misrepresented the nature of the evidence at the pre-trial conferences which took place on or about July 1, 1974. The second is that the defendant was prejudiced because the government failed to produce xeroxed copies of the customer's responses to the survey. The third is that the government's reference to the survey in closing argument was improper because it was not in evidence.

Defendant claims that government counsel misrepresented the results of the Internal Revenue Service customer survey by stating that it showed insignificant discrepancies between actual receipts and reported receipts. On January 23, 1974 the government filed its statement of compliance with Rule 2.04 listing the documents turned over to the defense. The survey was not turned over, and the government explicitly represented that "it has no material that fits within the scope of Local Rule 2.04(a) 2–6. The government did not turn over the results of the survey because it was its opinion that the material was not favorable to the defense. This opinion was borne out at trial in our hindsight view.

On March 15, 1974 the government made clear in open court that the survey was originally conducted with a specific items case in mind, but that it had been discarded when the proof evolved into a bank deposits case. The government pointed out that it had no intention of using the survey at trial. Further it was stated that the information contained in the survey would be considered 3500 material if the authors of the responses were ever to take the stand. The implication of this was again clear: the survey was not *Brady* material and thus was not exculpatory to the defendant. These representations were made in response to a motion for discovery by defendant's then attorney, Mr. Warren L. Schmidt. They were a matter of record when defendant's trial attorneys came into the case. In addition, Mr. Schmidt had told trial counsel about the survey and was present at trial.

At the conferences which occurred on or about July 1, 1974, Assistant United States Attorney Nash stated for the second time that the government did not intend to use the survey evidence at trial because it was insignificant to the presentation of the bank deposits case, and because the survey itself would have constituted inadmissible hearsay. Counsel for the defendant understood him to say that the discrepancies which were revealed by the survey were insignifi-

cant, an apparent misunderstanding which they imply led to their conclusion that the survey was in fact favorable to the defendant, thus accounting for its elicitation from Agent Hoak on cross-examination.

█ The defense did not demand that the government turn over the material under *Brady* or, alternatively, subpoena the survey for use in its case in chief. Instead, defendant's counsel chose to elicit the damaging testimony on cross-examination of one of the government's primary witnesses. The only conceivable explanation for this tactic is that counsel made an unfortunate mistake in not apprising himself of the precise nature of the survey results before eliciting it on his client's behalf. However, the government cannot be held responsible for a defense tactic which happens to strengthen the prosecution's case.

Defendant claims that the government failed to provide photo copies of the written responses to the survey. However the record and the supplementary affidavits establish that the survey was tendered and ultimately turned over to the defendant.

At the time the results of the survey were disclosed by Agent Hoak on cross-examination, the government indicated that defendant was welcome to the survey and agreed to produce it in court. At this time counsel for the defendant did not specifically request that the information be turned over.

On the following day of trial October 18, the government appeared in court with the summary and the letter responses upon which the summary was based. Defendant objected to the government's attempt to introduce this evidence by re-opening the direct examination of Agent Hoak. At this time the government again explained that it had had no intention of using this survey in the presentation of its case, but felt obliged to produce it to off-set the adverse inferences which defendant had raised concerning its absence. The court ruled that the government could intro-

duce the survey on rebuttal. Ultimately, however, neither the survey nor the patient responses were introduced into evidence by either of the parties.

In the afternoon of the same day, October 18, defendant's counsel made a "demand" for the survey in court. Counsel for the government indicated that the survey was being copied and would be provided to defendant as promptly as possible. The court suggested at this time that the details of the turnovers be concluded privately by the parties. At an informal meeting which took place outside the courtroom later in the day, the government counsel came away with the impression that defense counsel indicated that he would be satisfied with the summary itself since the information contained in it would simply be duplicative of the information contained in the customer responses. However, counsel denies making this representation in his affidavit. In the evening of the same day, October 18, counsel for the government met with the defendant's attorneys in the reception room of the United States Attorney's Office, where photo copies of the 25 page summary were turned over to the defense.

On Sunday, October 20, defense counsel called Mr. Nash and requested the 450 letter responses. Mr. Nash indicated that it would be impossible to get reproduction of these responses completed on Sunday but that he would attempt to get them copied on Monday. During the course of the next week defense counsel inquired on three occasions outside the courtroom whether the government had had the opportunity to complete the copying process. Mr. Nash indicated that the process was 95% completed and that counsel could pick them up at any time. The copies were not picked up.

The survey was not mentioned or referred to in open court during the entire week of October 21, until late Friday, October 25, during the presentation of motions at the close of all testimony. At that time defense counsel called the court's attention to the fact that the let-ter responses had not yet been turned over although receipt of the summary itself was acknowledged. The court observed that since the requests for "summary" or "survey" may well have been confused there was no indication that the government was withholding anything intentionally from the defense. The defense did not request that the court order production of the responses at this time, nor had it made such a request for a formal order at any other time during the trial.

■ It is apparent that all reasonable attempts were made to accommodate the defendant in his less than urgent requests for the survey data. If for some reason undisclosed in this record defendant indeed desired the copies, he could have formally requested an order from the court prior to the close of testimony. His failure to do so gives rise to a strong inference that defendant's "need" for these items was an afterthought.

■ Defendant's third claim with regard to the survey is that the government's reference to it during the course of closing argument was improper because the survey was not in evidence. The facts do not support this claim. In its closing argument the government restricted its observations to the defendant's opening statement and to the cross-examination testimony of Special Agent Stewart Hoak.

In his opening statement defendant's counsel referred to the survey when he represented to the jury that his cross-examination of Agent Hoak would destroy any government attempt to prove a specific item of unreported income. The subject was thus opened up in the first moments of trial. Subsequently, the defense forced Agent Hoak to testify on cross-examination at some length concerning the nature of the survey results. The subject was thus placed into evidence. The remarks of counsel were before the jury and the testimony of Hoak was in evidence, and it was to those statements that the evidence alone that the government responded in closing argument. Government counsel carefully

prefaced his references to the survey results by pointing out that they were based entirely on what "Agent Hoak said", and carefully limited his remarks to the evidence already adduced. He did not go beyond that testimony.

Finally, it should be noted that this was not a close case. The unexpected survey testimony certainly did not help the defense, but even without it the evidence was overwhelming that the defendant committed the offense charged. The discrepancies were large, they took place over a period of years, and the defendant failed to explain them. Defense counsel in this case made a tactical decision which did not detract nor contribute to the outcome of the case to any great degree. On this issue at the very most there was a misunderstanding here. The government could not breach its obligations with regard to the survey, when it had no such obligations. Consequently, in our opinion, the trial judge decided the question properly.

## VII. DID THE TRIAL COURT ERR IN REFUSING THE DEFENDANT'S INSTRUCTION REGARDING BANK DEPOSITS?

Defendant contends that the district court erred in not giving his requested Instruction No. 17 which read:

> "The bare fact standing alone, that a man has deposited sums of money in a bank does not prove that he owed income tax on those amounts."

The instruction was refused because the court determined at the instruction conference that it did not accurately reflect the theory of the defense as claimed. In response, counsel stated that his theory of defense was that cash earned, received or accumulated prior to the tax years in question was not income attributable to those years. With some modification, the court drafted and gave an instruction to this effect, in spite of the court's observation that the defendant had failed to put in any evidence of cash received in prior years.

 In view of counsel's own statement regarding the nature of his defense, and the "loan repayment" evidence which he introduced, it is apparent that Instruction No. 17 would have been misleading to the jury if given. In the present case, the government had established substantially more than "deposited sums of money standing alone". Furthermore, the defendant's case as presented did not support his claim to the court that the refused instruction embodied defendant's "most elemental and essential theory of defense." The instruction was properly denied.

Accordingly it is the decision of this Court that the conviction should be affirmed.

Affirmed.