**UNITED STATES of America, Appellee,**

**v.**

**Frank A. TEMPESTA, III, Appellant.**

**No. 78–1016.**

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1978.

Decided Dec. 5, 1978.

Rehearing and Rehearing En Banc Denied Dec. 28, 1978.

Randall D. B. Tigue, Minneapolis, Minn., for appellant.

Donald F. Paar, Asst. U. S. Atty., Minneapolis, Minn., for appellee; Andrew W. Danielson, U. S. Atty., Minneapolis, Minn., on the brief.

Before GIBSON, Chief Judge, LAY, Circuit Judge, and VAN PELT, Senior District Judge.[*]

VAN PELT, Senior District Judge.

Appellant was convicted on two counts of a three count indictment alleging that he willfully and knowingly filed false income tax returns for the years 1971 and 1972 in violation of 26 U.S.C. § 7206(1). He appeals claiming error in various trial and post-trial rulings by the district court. We affirm.

Defendant-appellant admitted that he was a gambler-bookmaker in the Minneapolis-St. Paul area. The government alleged defendant failed to report income from his gambling activity for the years 1971, 1972 and 1973. Since the defendant had destroyed the records of his gambling activities, the government reconstructed his income through the use of the bank deposit-currency expenditure method. This method analyzes the deposits to both checking and savings accounts to determine whether they are income or non-income, then looks for indications of gambling receipts or moneys not deposited in such accounts but used to purchase various goods, and finally subtracts out cash withdrawals where there is no indication how the withdrawn money was spent. Using this method, the government alleged that defendant's taxable income for 1971 should have been $15,523.57 instead of the $6,520.77 reported by him, for 1972 should have been $25,848.82 instead of $12,462.00, and for 1973 should have been $41,004.17 instead of $10,367.00. The defendant alleged that he had accurately reported his gambling income on Schedule C of his tax return as miscellaneous income, that certain deposits to his parents' bank account represented repayments of loans, and that the $25,000 paid by his parents in cash to purchase a Dairy Queen in 1973 was not financed by him but was saved by his father from income never reported to the Internal Revenue Service. The jury was unable to reach a verdict at the first trial. A second trial was held and the jury found defendant guilty of filing a false return for the years 1971 and 1972, but was unable to reach a verdict with regard to Count III alleging unreported income for the year 1973.

On appeal, appellant alleges the trial court erred in the following respects:

[*] Robert Van Pelt, Senior United States District Judge, District of Nebraska, sitting by designation.

1. Denying a post-trial motion for arrest of judgment based on prejudicial preindictment delay;
2. Denying defendant's motions for judgment of acquittal;
3. Allowing the government to cross-examine a defense character witness as to whether he was aware of defendant's 19 year old felony conviction after the witness had already testified on direct that defendant had always kept his word and all dealings with him were honorable;
4. Refusing to give a requested instruction; and
5. Denying a motion for new trial on the basis of newly discovered evidence.

## I. PREINDICTMENT DELAY

The indictment related to tax returns filed for the years 1971 through 1973. During the trial, a special agent for the Internal Revenue Service testified that he had begun his investigation of the defendant in February of 1974 and completed it in October of 1975. He indicated that his report was then reviewed and there might have been additional work done after that. An indictment was not returned until June 13, 1977. Appellant alleges that under *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), prejudice has been shown because:

1. There is no evidence justifying a three-year delay, or the twenty months between completion of the agent's report and the return of the indictment;
2. During the preindictment delay the only two witnesses who could have testified from direct knowledge as to defendant's father's financial status died.

■ There must be proof of actual prejudice before an indictment will be dismissed. *United States v. Stacey,* 571 F.2d 440, 443 (8th Cir. 1978). Proof of prejudice alone is not sufficient for dismissal of an indictment without consideration of the reasons for the delay. *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

■ It is questionable how much, if any, prejudice actually accrued to the defendant by the loss of these two witnesses. Defendant's father was an upholsterer who worked for a company during regular business hours and had a shop in his garage where he worked evenings and weekends. Appellant alleges that these witnesses were the only persons who had direct knowledge of how much money the shop in the garage brought in. Since part of defendant's defense was that deposits to his parents' account were the repayments of loans and that the $25,000 in cash paid by his father to purchase a Dairy Queen did not come from him, it was necessary to show that his parents could afford such expenditures. This was difficult where the father's Social Security earnings showed he had never reported more than $6,500 in any one year from his regular occupation. The first alleged material witness was Nicholas DeGidio. An affidavit from his wife indicated that DeGidio worked off and on for defendant's father for two years, primarily around holidays, for as long as a week at a time. The second alleged material witness was Leonard Schwartz. An affidavit from an acquaintance established that Schwartz did sewing work for defendant's father. Defendant produced approximately eighteen witnesses who testified concerning defendant's father's occupation, the long hours he worked, how fast he could work, the number of pieces they saw delivered per week, the number of frames sitting in his shop, the quality of his work, and the approximate price per piece which he might receive. In addition to this testimony, there were also witnesses who testified as to the type of furniture in the father's house, the meals which were served, and the toys which the children had as indicative of the family's wealth. It is difficult to conclude that these two witnesses would have been other than cumulative. Even the defendant's mother did not know their financial situation and was aware only that her husband kept a money box with cash in it which was found empty upon his death.

Any prejudice to defendant was speculative at best. Further, the government presented the lower court with additional information regarding the delay. Judge Larson's Memorandum Order indicated that although the initial report was completed in October of 1975, further investigation occurred apparently during the first half of 1976 and the file was reviewed by regional counsel and by the Tax Division in Washington, D.C. before the government officially decided to prosecute the case. *Lovasco, supra,* drew a distinction between allowing the prosecutor leeway in deciding whether there is sufficient evidence to proceed and governmental delay which is undertaken to gain a tactical advantage. There is no indication here that the government intentionally sought to prejudice defendant's case. The fact that the defendant kept no records of his gambling activity and after an initial interview refused to talk with investigators upon the advice of his attorney, only served to lengthen the investigation and make the presentment of the case more difficult. We see nothing to indicate that this is the type of case which should be dismissed for preindictment delay.

## II.  MOTIONS FOR ACQUITTAL

■ Defendant made a motion for acquittal at the end of the government's presentation and at the close of all the evidence and renewed these motions after the jury's verdict. On appeal, he argues that the jury verdicts as to Counts I and II were not supported by the evidence and should be reversed. The evidence must be viewed in a light most favorable to the government, and we accept as established all reasonable inferences which support the conviction. *United States v. Scholle,* 553 F.2d 1109, 1118 (8th Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977); *United States v. Frazier,* 545 F.2d 71, 74 (8th Cir. 1976), *cert. denied,* 429 U.S. 1078, 97 S.Ct. 823, 50 L.Ed.2d 798 (1977).

■ The bank deposit-currency expenditure method of showing unreported income

has been approved in a number of cases. *See United States v. Esser,* 520 F.2d 213, 217 (7th Cir. 1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); *United States v. Morse,* 491 F.2d 149, 151 (1st Cir. 1974); *United States v. Slutsky,* 487 F.2d 832 (2d Cir. 1973), *cert. denied,* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974). Appellant admits that this is in general an accurate method of computing income, but argues that it has no relevance

> to the instant case, in which the prosecution's own expert conceded that the system would not be accurate, if the fact situations testified to by all witnesses at trial were in fact true.[1]

Actually, all this amounts to is a credibility question which was resolved by the jury in favor of the government. As in *United States v. Todwick,* 410 F.2d 1202, 1204 (8th Cir.), *cert. denied,* 396 U.S. 841, 90 S.Ct. 105, 24 L.Ed.2d 92 (1969), which also involved a violation of 26 U.S.C. § 7206(1), the government presented substantial evidence which, if believed by the jury, would support the conviction. The defendant offered testimony which, if believed, would preclude the conviction. We have examined the record thoroughly. Without detailing all of the witnesses and exhibits, the record in general shows the government presented evidence that checks from several different sources were deposited to defendant's account or that of his family, including his future wife. At trial, some makers of these checks could not remember the circumstances under which they had given the check to defendant and some claimed not to know him at all. However, others admitted that the checks represented payment to defendant of a gambling loss. In computing the unreported income, the government included all of the checks deposited to various accounts by defendant unless the maker of a check specifically stated that it was repayment of a loan. In showing the volume of gambling business the defendant handled, the government presented a summary (which was not evidence or used to compute income) extracting all of the checks which

---

1. Reply brief at 9.

were cashed by defendant at a certain restaurant and bar where the defendant accepted gambling bets. Between September and December, 1972, which is during the football season, defendant cashed over $11,000 worth of checks at the restaurant. It should also be pointed out that most gambling transactions are in cash, not checks, so the difficulty of pinpointing any specific amount of unreported income was enhanced. Defendant argues that only 10% of the checks should have been included as income since a bookmaker generally tries to even out his bets and after paying the winners he is left with the 10% "juice" fee charged losers.[2] However, as the Internal Revenue Service agent explained at the trial, the money defendant paid out to winners was not shown anywhere as income, so if it were added in and then subtracted as a business expense, and then the losers' payments were added as income, the net result would be exactly the same.

■ Defendant also alleges that the government failed to follow all leads which might exculpate him as required by *Holland v. United States,* 348 U.S. 121, 135–36, 75 S.Ct. 127, 135, 99 L.Ed. 150 (1954). However, the *Holland* opinion indicates that government agents "did not bother to check petitioners' story . . . ." *Id.* at 135, 75 S.Ct. 135. Defendant here refused to discuss his gambling and gave very few "leads." An agent had two interviews with defendant during which time the defendant indicated he had received a loan totalling $5,000 from his father during 1970 and 1971 but that he could not remember what he had used the money for and did not think it had been deposited to a savings or checking account. He also mentioned a $5,000 loan from his wife's mother toward the end of 1972 which he used to pay for real estate. He admitted that some checks deposited to his account would have been from gambling and that some checks written to cash might have been to cover gambling losses. De-

fendant did not wish to further discuss his gambling with the agent. Defendant contended at trial that he had two gambling partners during the fall of 1972 and that he handled all of the money for the operation. The government independently contacted one of the gambling partners, but this person refused to talk with them. It should be noted that the bank deposit method does tend to indicate moneys received solely by defendant because any cash withdrawals are subtracted. In following leads, the government contacted numerous people who had written gambling checks or unexplained checks which the defendant cashed or deposited and several of these people were witnesses at the trial. Defendant maintains the government should have contacted witnesses concerning his father's independent upholstery business and financial affairs. However, none of the witnesses produced by defendant were specific or conclusive on the amount of the income made from this business. The petitioner's conviction related to the years 1971 and 1972. By that time defendant's father was no longer actively in business. His wife testified that after his second heart attack in the mid 1960's defendant's father took it easy. Most of the witnesses were testifying as to a time period in the 1950's or early 1960's. Whether defendant's father would have had any money left in the 1970's, after suffering two heart attacks, was speculation. The investigators had looked at defendant's father's Social Security records, income tax returns, and bank account. These did not reflect any great wealth. As stated by both *Holland, supra* at 138, 75 S.Ct. 127, and *Esser, supra* at 217, government investigators are not obliged to track down every remote lead a taxpayer might possibly offer. We believe both the investigation and evidence were sufficient in this case to sustain the conviction.

**2.** Several witnesses, including defendant, testified that if a person placed a $50 bet with a bookmaker and lost, he would be required to pay $55, or 10% more than the bet. Defendant argued that in some instances a bookmaker

might lose money because of uneven betting on events or simply because the losers did not pay, so the income would be even less than 10%.

## III. CROSS EXAMINATION OF CHARACTER WITNESS

Defendant called a government witness as his own witness to testify to his character and reputation. This witness testified that defendant had always kept his word and all business dealings with him were honorable. The government was then allowed to inquire whether the witness was aware of whether the defendant had any felony convictions.[3] The witness responded that he was aware that defendant had been convicted of burglary in 1958 in Minnesota and that the maximum penalty was zero to five and that the defendant had been sentenced for three years. Although it was not made known to the jury, the witness and the defendant had served time together in prison. Defendant's counsel was aware that the government was in possession of the information relating to defendant's prior conviction and the witness' knowledge of it.

Appellant argues that the district court did not make any finding at the trial that the probative value of the cross-examination exceeded its prejudicial impact, and that no cautionary instruction was given by the trial court to indicate that the testimony was admissible for the limited purpose of impeachment.

█ After the defendant had used the witness to testify as to his character and reputation, a conference took place outside the jury's presence as to whether or not the government could use the prior conviction. At that time defense counsel argued that since the conviction was more than ten years old, it should not be admissible under Fed.R.Evid. 609(b), that it did not constitute evidence of motive, opportunity, intent or preparation under Fed.R.Evid. 404(b). Defense counsel indicated that the testimony might be admissible to impeach the witness' testimony, but that this could not be done without the court weighing the probative value against the unfair prejudice.

Counsel did not request a limiting instruction, but at that point stated:

> There is no way I would submit any curative instruction would enable a juror, in his own mind, to separate admitting a conviction for the basis of impeaching Mr. Anderson, and not considering it substantively for the character of the defendant, for which it is clearly inadmissible.[4]

Thus, not only did defendant's counsel not request a limiting instruction, but indicated that such instruction would not be beneficial. The trial court permitted the questioning on the basis of *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *United States v. Burgard,* 551 F.2d 190 (8th Cir. 1977); and Fed.R.Evid. 405(a). *See also United States v. Evans,* 569 F.2d 209, 210 (4th Cir.), *cert. denied,* 435 U.S. 975, 98 S.Ct. 1624, 56 L.Ed.2d 69 (1978); 2 Weinstein's Evidence ¶ 405[2] at 405–20 and ¶ 405[4] at 405–40. We believe the questioning which occurred was proper. The trial court recognized in its post-trial memorandum that the better practice is for the court to instruct the jury as to the limited purpose of the conviction even without a motion by the defendant. However, under the specific fact situation occurring here, any error was in large part induced by defense counsel's own actions and a new trial is not warranted.

There is no indication that the trial judge did not weigh the probative value against the prejudice. His post-trial memorandum specifically concluded that defendant's convictions for burglary related to defendant's trustworthiness and the value of the witness' opinion. The court refused to allow the government to introduce copies of the conviction records, and indicated the scope of the inquiry must be limited and directed to the character testimony. We conclude no error occurred in this respect.

## IV. DENIAL OF REQUESTED JURY INSTRUCTION

Defendant requested that the jury be given an instruction as follows:

---

**3.** Defendant had three different felony convictions for burglary. However, the witness was only aware of one, and the government did not inquire about the other two convictions.

**4.** T. II at 202.

Under the Internal Revenue Code, a person's gambling losses are deductible from his income, up to the extent of his gambling gains.

Although not verbatim, this is in substance a provision of the Internal Revenue Code. See 26 U.S.C. § 165(d). The district court in its memorandum opinion said that the requested instruction correctly stated the law but felt that it was unnecessary in light of the government's method of proof. As explained earlier in part II of this opinion, the government's bank deposit-currency expenditure method tended to show only the net income to defendant. Defendant attempted to discredit this method of proof by bringing in a former IRS agent who took out all the items of income he felt were not income, then subtracted out a percentage of items that he considered were questionable. If the items defendant's expert labelled as "nonincome" were subtracted out, defendant was still shown as underreporting his income for all three years. If an additional percentage was subtracted for questionable items, the expert's calculations showed defendant's income underreported for 1971 and 1973 by a total amount of only $3,200. These summaries prepared by defendant's expert were admitted only for illustrative purposes. Defendant's expert testified that he had not considered an alleged $5,000 loan in 1971 from defendant's father and if the loan were made it would decrease the income for 1971 to less than that shown on the tax return. In order to discredit the government's proof, the expert made no use of any theory concerning gambling losses. The defendant took the stand and testified on his own behalf. He at all times maintained that he had accurately reported all gambling income and that he had kept a notebook with a running total of his profits on a back sheet while the weekly records were destroyed.[5] The defense did not turn on specifically claimed losses. Instead, it tried to impress upon the jury that in order for defendant to have made the profit the government claimed, he would

have had to have done an enormous business since his income was limited to 10% or less of the total amount of bets placed.

■ This appears to be a case of first impression regarding whether, in the absence of specific proof of losses, it is reversible error not to have given an instruction dealing with the deduction of losses. We believe that the better practice would have been to give the instruction but in view of the evidence in this case it was harmless error. The defendant's prime defense was that he had always reported all of his income. The bank deposit method of proof is recognized as an appropriate way to show additional income, and it was up to the jury to determine whether these items truly reflected additional income or were questionable as defendant's expert contended. We conclude that defendant received a fair trial, and was not prejudiced.

## V. NEWLY DISCOVERED EVIDENCE

■ A 1970 document relating to an Internal Revenue audit of defendant's father was produced at the trial which bore the signatures of both defendant's father and mother. Defendant testified his father was not told about the audit because of his health. In closing arguments, the prosecutor pointed out to the jury that both the husband and wife's signatures appeared on the document. The defense counsel then argued that the jury should compare the signatures on the document and urged the jury to find that both signatures were made by defendant's mother. The newly discovered evidence which defendant claims he has is a handwriting analysis which would presumably show the signatures to be made by the same person. Like the trial court, we believe that this does not constitute newly discovered evidence. *See United States v. McColgin,* 535 F.2d 471, 476 (8th Cir.), *cert. denied,* 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 128 (1976), for the five prerequisites which must be met before a new trial can be granted on the grounds of newly

5. The actual notebook, however, had been destroyed prior to trial. Defendant indicated once his tax return was prepared he threw it

away because he had no further need for it and was concerned about being arrested for gambling.

938

discovered evidence. Defendant's theory was before the jury in closing arguments. We do not deem it so crucial a point that it would probably produce an acquittal.

For the foregoing reasons, the judgment appealed from is affirmed in its entirety.