**UNITED STATES of America, Appellee,**

v.

**Stanley R. KING, Appellant.**

**No. 79–1689.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 17, 1980.
Decided Feb. 27, 1980.

J. Christopher Cuneo, Minneapolis, Minn. (argued), and Henry H. Feikema, Smith, Juster, Feikema, Malmon & Haskvitz, Minneapolis, Minn., on brief, for appellant.

Donald F. Paar, Asst. U. S. Atty., Minneapolis, Minn. (argued), and Thorwald H. Anderson, Jr., U. S. Atty., Minneapolis, Minn., on brief, for appellee.

Before LAY and STEPHENSON, Circuit Judges, and THOMAS,* Senior District Judge.

DANIEL HOLCOMBE THOMAS, Senior District Judge.

Taxpayer appeals from his conviction by a jury in a suit charging appellant with two counts of wilful tax evasion for the years 1972 and 1973, in violation of Title 26, United States Code, Section 7201. Appellant was found guilty of both counts.

The Government contended first, that appellant had taken improper deductions, especially for 1972. Secondly, the Government charged that in both years he received taxable income which was not reported.

Affirmed.

The indictment was handed down in February 1979. Because of technical flaws, an information was substituted for the indictment with appellant's consent. The information concerned itself with tax years 1972 and 1973. Appellant was tried before a jury in the United States District Court for the District of Minnesota, the Honorable Donald D. Alsop, presiding. The trial began on April 16, 1979, and concluded on April 30, 1979. He was found guilty as charged. On June 20, 1979, he was committed to the custody of the Attorney General for a term not to exceed fourteen months. Execution of that sentence was stayed

---

* The Honorable Daniel H. Thomas, Senior United States District Judge, Southern District of Alabama, sitting by designation.

pending appeal. Appellant's initial petition to proceed in forma pauperis was denied. On reconsideration, the petition was granted.

Appellant's activities in 1972 and 1973 formed the basis of two separate types of charges regarding his alleged evasion of taxes for those years. The Government contended, first, that appellant had taken improper deductions, especially for 1972. Secondly, the Government charged that in both years he had received taxable income which was not reported.

Improper Deductions

In 1971, the appellant Stanley R. King was one of the founders of Twin Cities Open Door Fellowship (TCODF) Church, located in St. Paul, Minnesota. He served as pastor during the years 1972 and 1973. He was ordained by a local church in Phoenix, Arizona, but not by an accredited theological seminary. King received compensation of $300.00 per month. Such compensation was termed "love offerings" in light of King's request that he receive no salary. Appellant claimed a $3,600.00 housing allowance on both his 1972 and 1973 tax returns. In support of this a document was submitted by King's tax accountant showing a $2,640.00 per year housing allowance from TCODF which was prepared by King and signed by the Finance Minister at King's request.[1] However, such an allowance had not been authorized by the TCODF Church.

In 1972 King claimed charitable deductions of approximately $13,000.00 to the TCODF Church. Of this amount approximately $12,000.00 was for the down payment on the house, hereinafter discussed.

In 1972 King needed housing but was unable to secure financing. He proposed to TCODF that it purchase a house because it could acquire the necessary financing and he could not. King was to donate the down payment. The plan was accepted. He deposited $12,000.00 in the TCODF account for the earnest money and down payment. The house, though purchased in the church's name, never appeared on the church's assets. King made the mortgage payments and remodeled the house and occupied the house as a parsonage.

The house was sold in 1975. The profit from the sale exceeded $19,000.00. A check for that amount was endorsed by the Finance Minister without using a TCODF endorsement stamp. Subsequently, King deposited the check in the TCODF's Minister's Fund account over which he had sole control. Such proceeds were later used by King for personal debts as well as living expenses. King and his wife were listed as sellers of the house, not TCODF.

Failure to Report Income

Appellant failed to maintain any personal checking account in his own name. He did, however, have an account in the name of Human Resources Consultants, which he used as his personal checking account.

The Government claimed that in 1972, King failed to report the following consulting fee income:

| | |
|---|---|
| First Minnesota Construction Company | $14,450.00 |
| Intercontinental Development Company | 7,000.91 |
| United National Development Company | 3,000.00 |

The Government claimed that in 1973, King failed to report income and consultant fees in the following:

| | |
|---|---|
| Bethlehem Square Limited Dividend Corp. | $52,000.00 |
| MIA Limited Dividend Corporation | 14,025.00 |
| MIA Properties | 4,850.00 |
| | 6,935.00 |
| Lambrecht Realty | 5,000.00 |
| Monthly "Love Offerings" from the TCODF Church | 3,300.00 |
| Universal Enterprises Unlimited | 4,100.00 |
| Chapdelaine Properties | 2,000.00 |
| Cecil Newman Courts | 550.00 |

Appellant's living expenses for 1972 were between $45,000.00 and $50,000.00. He admitted, on cross examination, to having seen a copy of the Bethlehem Square Limited Dividend Corporation partnership return. He admitted having received a check

---

1. Government Exhibit 14-3.

for $50,000.00. This amount was not reported to his tax accountant.

Inasmuch as the appellant raises the issue of the sufficiency of the evidence to prove his guilt beyond a reasonable doubt, it is necessary to review the facts at length.

Much of the dispute resulted from appellant's involvement in a number of "HUD 236" housing projects. HUD 236 housing projects were part of a program under which the Government insured mortgages on apartment complexes for low and moderate income families. A portion of the mortgage was subsidized when qualified low-income renters were occupying the project. HUD regulated the kinds of rents that could be charged, and regulated the cost of construction of the project. The project sponsors had to comport with its rules and regulations. There had to be a separate legal entity sponsoring each individual project.

Appellant first became interested in the prospect of developing this type of project in the Twin City area in 1967. At that time he was the executive director of Twin Cities Opportunity Industrial Center (TCOIC). He was attending an O.I.C. Conference in Washington, D.C., when the then Secretary of HUD announced that this new housing program would be launched. When appellant returned to the Twin City area he met with members of the Minneapolis Housing and Redevelopment Association, the Mayor of Minneapolis, and other people in the community. With his assistance, the Midwest Improvement Association (M.I.A.) was founded. M.I.A. hired a housing specialist to act as a consultant in putting together a package to present to HUD. Appellant worked as project coordinator. He was also the executive secretary of M.I.A.

Finally, in 1970, the first of the projects was constructed. M.I.A. was the non-profit sponsor. The first project was called Cecil Newman Plaza. M.I.A. was also the sponsor for what became known as Cecil Newman Courts, which was completed sometime in 1971. At the same time M.I.A. was trying to develop a housing project in St. Paul, which would eventually become known as Lonnie Adkins Courts.

When Cecil Newman Plaza began operation, a firm was hired to manage the rental operations. There were immediate problems with cash flow. Because of increased costs subsequent to the submission of the original budgets, as well as HUD's refusal to increase rents, there was not enough money to pay for expenses incurred. The original manager pulled out after about six months of managing the project. They had been training a young man to assist in the project management. However, that individual soon left, leaving both Cecil Newman Plaza and now Cecil Newman Courts without anyone to do the housing management. It was at that point that appellant helped organize M.I.A. Properties, Inc., to serve that function.

It was also at this point in time that appellant was asked by the non-profit sponsor of a similar project to serve as a paid consultant in order to get the project off the ground. Appellant was successful in organizing and putting together this non-profit project. It was brought to the construction stage by the middle of 1972.

During this time appellant was still involved in developing the Lonnie Adkins Courts project through his association with M.I.A. It became apparent that Lonnie Adkins Courts could not get HUD approval for funding if it continued to operate with a non-profit sponsor. Therefore, the concept of a limited dividend corporation was explored. Appellant testified that he was probably told of the possibility of a limited dividend corporation by the mortgage company that was the interim lender on the St. Phillips Gardens project. Although a limited dividend corporation sponsorship does not receive the same percentage of guaranteed mortgage funds from HUD, it is able to attract investors in order to make up the construction costs. Appellant thus helped form MIA Limited Dividend Corporation to serve as a corporate general partner in the limited partnership which would sponsor the Lonnie Adkins project. He served as its president. The initial endorsement on the Lonnie Adkins project occurred somewhere in the early part of 1973.

The other housing project with which appellant was involved was called the Bethlehem Square project. It was located in Pueblo, Colorado. A minister friend of appellant's had purchased property in that area. Knowing of appellant's burgeoning experience in the field, he asked appellant to see if low-income housing could be built on the land that he had purchased. That is what eventually happened. Another limited partnership was formed, having as one of its general partners a Bethlehem Square Limited Dividend Corporation. Appellant was a signatory on the Bethlehem Square Limited Dividend Corporation account, but was not an officer of that corporation.

The checks that made the basis of the Government's claim that appellant failed to report taxable income were made out either to appellant or to Human Resources Consultants (HRC), a company owned by appellant. Those checks appear in summary form on Government's Exhibit 53–13. These amounts have heretofore been set out.

The Government made similar contentions with regard to unreported income for 1973. The amounts have heretofore been set out.

Appellant had no personal savings or checking accounts in 1972 and 1973. All of his transactions went through the H.R.C. account. Appellant contended that monies received in the H.R.C. account were used to bail out existing housing projects that were experiencing financial crises, and to that extent, appellant was merely a conduit for funds. Because of HUD regulations, money could not be transferred directly from one source to another. Yet without those transfers, the projects would have collapsed. Therefore, it became a matter of borrowing against the future to keep alive what had theretofore been established.

King testified that the amounts claimed by the Government as unreported income were loans and remain unpaid. They did not appear as creditors on the Record of Bankruptcy Proceedings, filed by King on June 4, 1977.[2]

Appellant raises five (5) issues on appeal upon which he bases his allegations of trial court impropriety.

## I. WAS THE EVIDENCE SUFFICIENT TO PROVE APPELLANT GUILTY BEYOND A REASONABLE DOUBT?

The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether the record reasonably supports a finding of guilt beyond a reasonable doubt. Appellant would have us believe that viewing the record in a light most favorable to the government, the evidence was insufficient as a matter of law to convict him. Such a claim is without merit.

Willfulness as used in Title 26, United States Code, Section 7201, means a voluntary intentional violation of a known duty. *United States v. Bishop*, 412 U.S. 346, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 341 (1973); *United States v. Olson*, 576 F.2d 1267 (8th Cir. 1978). The record clearly indicated appellant's voluntary and intentional evasion of taxes for the years 1972 and 1973.

The question of willfulness is for a jury to decide. *United States v. Gaskill*, 491 F.2d 981 (8th Cir. 1974); *Rollinger v. United States*, 208 F.2d 109 (8th Cir. 1953). The jury's decision was in the affirmative.

Evidence of a consistent pattern of not reporting large amounts of income is in itself, evidence of willfulness. *See, Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Vavelli*, 595 F.2d 402 (8th Cir. 1979); *United States v. Rischard*, 471 F.2d 105 (8th Cir. 1973). The record is replete with such action by appellant. King, in his sworn testimony to Grand Jury, denied having received the $50,000.00 check from the partnership in Denver and that he never saw the partnership return. But admitted on cross-examination in trial to the contrary.

2. Government Exhibit 59.

He testified that all or most of his consulting fees were loans which remained unpaid. Yet he admits, and the Bankruptcy Court records show, that he did not list the various sources as creditors on his tax returns. Appellant asserts in his brief that he relied on his tax accountant as to the housing allowance and other deductions. Yet King himself did not tell his tax accountant that the church had not authorized a housing allowance, nor did he tell his tax accountant that the receipt for the charitable contribution was also unauthorized. He asserts that the discrepancies in his returns are due primarily to the fault of his accountant, together with his lack of knowledge as to methods of proper records keeping and not willfulness on his part. This was the question for the jury to decide. We find the evidence amply sufficient.

## II. WAS THERE PROSECUTORIAL MISCONDUCT OF A MAGNITUDE TO REQUIRE A REVERSAL OF THE TRIAL COURT'S DECISION?

Appellant alleges reversible error as a result of what he deems disparaging comments made by the prosecutor to the jury throughout the trial, and especially during closing arguments. While appellant cites numerous instances of such conduct, we will focus on that which we believe to require the closest scrutiny as possibly having adverse effects.

During his closing argument to the jury, the Government prosecutor argued:

> Now how are we going to or how are you, because I don't have that problem anymore, that was a decision I had to make before I brought this case into Court and presented it to a grand jury and had an arraignment and got it before you, and that was a decision I had to make way back then as to whether or not what we call management fees, consulting fee advances or consulting fees or what have you was income or whether or not those other items were in fact wrongful, im-

proper, fraudulent type of deductions on a tax return. It is now going to be up to you * * *

Objection was made to this statement. The objection was sustained.

Such comments must, we feel, be read in light of this Court's decision in *United States v. Splain*, 545 F.2d 1131, 1134 (8th Cir. 1976), opinion by Judge Gibson.

Despite the objectionable nature of prosecutorial comments on defendant's guilt, courts have not yet adopted a *per se* rule mandating reversal of a conviction in all cases where such a comment is made.[3] *See generally*, Annot., 50 A.L.R.2d 766 (1956); 5 *Wharton's Criminal Law and Procedure* § 2084 (1957); *Splain, supra*; *Contra, Greenberg v. United States*, 280 F.2d 472, 475 (1st Cir. 1960).

■ The facts of each case must be reviewed independently to ascertain whether the comment was "unduly prejudicial", *United States v. Greene*, 497 F.2d 1068, 1085 (7th Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975), or was "plainly unwarranted and clearly injurious". *Mellor v. United States*, 160 F.2d 757, 765 (8th Cir. 1947), *cert. denied*, 331 U.S. 848, 67 S.Ct. 1734, 91 L.Ed. 1858 (1947). Reversal is in order only if the court determines that the jury verdict could reasonably have been affected by the argument. *United States v. Tortora*, 464 F.2d 1202, 1207 (2d Cir. 1972), *cert. denied sub nom., Santoro v. United States*, 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972); *Devine v. United States*, 403 F.2d 93, 96 (10th Cir. 1968), *cert. denied*, 394 U.S. 1003, 89 S.Ct. 1599, 22 L.Ed.2d 780 (1969).

■ One important factor to consider in determining whether a closing argument is so prejudicial to require reversal of the conviction is the amount of evidence indicating defendant's guilt. If the evidence of guilt is overwhelming, an improper argu-

---

**3.** There is a line of cases holding it not to be reversible error for the prosecutor to state his personal belief in the guilt of the accused if the opinion is based on the evidence adduced at trial and if the jury is not led to believe that the opinion is based on evidence not included in the record. *Schmidt v. United States*, 237 F.2d 542, 543 (8th Cir. 1956).

ment is less likely to affect the jury verdict. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Hamilton*, 455 F.2d 1268, 1270 (3rd Cir. 1972). On the contrary, if the evidence of guilt is weak or tenuous, the existence of prejudice is more easily assumed. *Berger v. United States*, 295 U.S. 78, 88–89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

■ We have, in the present case, substantial and persuasive evidence which is highly implicative of King's participation in the tax evasion scheme. The overwhelming evidence of guilt in this case convinces us that the prosecutor's comment could not have prejudiced King or affected the jury verdict. *United States v. Chrisco*, 493 F.2d 232, 237–38 (8th Cir. 1974), *cert. denied*, 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 77 (1974).

In this case, counsel's objection to the argument was sustained, at which time Judge Alsop stated, "The jury will not take that into account in their deliberations." Consequently, even if it could be considered error, it was corrected by the Court.

## III. WERE THERE ERRORS IN THE INTRODUCTION OF EVIDENCE WHICH PREJUDICED APPELLANT'S RIGHT TO A FAIR TRIAL?

■ Appellant cites two instances by the trial court in its admission of evidence which he claims prejudiced his right to a fair trial. The first occurred when the trial court allowed certain government documents which were highlighted with a magic marker to go to the jury in such fashion. When the documents were received into evidence the highlighting had already been done. The trial court gave limiting instructions in its charge to the jury in regard to what emphasis should be placed on the highlighting. The Government contends and we agree, that error, if any, should have been claimed when stipulations to the evidence were made. Such evidence did not in our opinion, prejudice appellant's right to a fair trial. *See, United States v. Tempesta*, 587 F.2d 931, 936–937 (8th Cir. 1978).

■ Ms. Jane Sweet was called as a summary witness by the Government. She is an I.R.S. agent, trained as a certified public accountant. After demonstrating her expertise, Ms. Sweet was qualified as an expert witness. *See*, Rule 702, Federal Rules of Evidence. Ms. Sweet testified after having heard all the testimony in the case and having reviewed all the evidence. The testimony of a summary witness may be received so long as she bases her summary on evidence received in the case and is available for cross-examination. *United States v. Esser*, 520 F.2d 213 (7th Cir. 1975).

■ The Government offered several organizational charts, prepared by Ms. Sweet, for the different projects which were discussed. Objection was taken by appellant to the introduction of these charts on the ground that the organization of housing projects was not within Ms. Sweet's expertise. Additionally, objection was made as to the inaccuracy of several of the exhibits and to the characterization of transactions portrayed in said exhibits. The evidence was allowed to be used over the objections. Concededly, the trial judge was satisfied that the summaries were reasonably accurate and that there was evidence to support them. From that determination we shall not differ. Where charts which fairly summarize the evidence are used as an aid in understanding the testimony already introduced and the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summary, the use of charts is proper. *Gordon v. United States*, 438 F.2d 858 (5th Cir. 1971). Evidential use of such summaries rests within the sound discretion of the trial judge, whose action in allowing their use may not be disturbed by an appellate court except for an abuse of discretion. *United States v. Smallwood*, 443 F.2d 535, 540 (8th Cir. 1971). We find no such abuse.

■ The appellant objects to the introduction of evidence as to facts which occurred after the tax years in question. These facts were properly included in the Government's case. The Government intro-

duced evidence to show that the proceeds from the sale of appellant's house and the charitable contribution ended up in appellant's personal account and were then used for his personal expenses. The evidence was necessary in order for the jury to properly decide whether the church actually owned the house and if it was only a paper transaction. The appellant claims error in that the court refused to allow him to stipulate these facts under Rule 403 of the Federal Rules of Evidence. We see no error in this.

As stated in *U. S. v. Spletzer*, 535 F.2d 950 at page 955 (5th Cir. 1976):

It is true that as a general rule a party may not preclude his adversary's proof by an admission or offer to stipulate.

.     .     .     .     .

Nonetheless, this principle, like all rules of evidence, is subject to the provision that where the probative value of relevant evidence is substantially outweighed by its potential for unfair prejudice, it should be excluded.

Such is not the case here.

As stated in *Parr v. United States*, 255 F.2d 86, 88 (5th Cir. 1958)

It is a general rule that 'A party is not required to accept a judicial admission of his adversary, but may insist on proving the fact.' 31 C.J.S. Evidence § 299, p. 1068. The reason for the rule is to permit a party 'to present to the jury a picture of the events relied upon. To substitute for such picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight.'

## IV. WAS THERE PLAIN ERROR WITH REGARD TO APPELLANT'S EXERCISE OF HIS FIFTH AMENDMENT RIGHTS?

This issue is raised for the first time on appeal. While appellant states the correct status of the law as to the impermissible practice of penalizing a defendant for exercising his constitutional right to remain silent when under custodial interrogation, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he concedes the failure of counsel to raise such an objection at the trial level. These claims were not raised before the District Court and, accordingly, will not be considered for the first time on appeal. *United States v. Librach*, 536 F.2d 1228 (8th Cir. 1976). Appellant's claim that he should not be made to pay for such nonfeasance is without merit.

## V. DID THE TRIAL COURT ERR IN REFUSING TO GIVE AN INSTRUCTION ON A LESSER INCLUDED OFFENSE?

A defendant is entitled to an instruction on a lesser included offense if: (1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) there is some evidence which would justify conviction of the lesser offense; (4) the proof on the element or elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense; and (5) there is mutuality, i. e., a charge may be demanded by either the prosecution or defense. (Emphasis omitted)

*United States v. Thompson*, 492 F.2d 359, 362 (8th Cir. 1974); *United States v. Brown*, 551 F.2d 236, 239 (8th Cir. 1977).

The Supreme Court has stated:

But a lesser-offense charge is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as to the lesser and greater offenses. (Citations omitted). In other words, the lesser offense must be included within but not, in the facts of the case, be completely incompassed by the greater. A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense.

*Sansone v. United States*, 380 U.S. 343, 349–350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1969).

The elements of Title 26, United States Code, Section 7201, are wilfulness and the existence of a tax deficiency with the intent to evade. The elements of Title 26, United States Code, Section 7207 are wilfulness and the commission of the prohibited act, *i. e.,* the filing of the document known to be false or fraudulent. *Sansone v. United States, supra,* 1010. Applying the foregoing principles to the case before us, we must examine the Government's three areas of proof: (1) Unreported consultant fees; (2) Improper claim for charitable deduction for down payment on a house; (3) Improper deduction for housing allowance.

■ Appellant alleged that the consultant fees were either loans, or advances for expenses; that his salary was a gift (love offering); that he truly believed he was entitled to a housing allowance set off, and that the down payment for the purchase of the house was a gift to the church. The defense offered no evidence to rebut the Government's computation of total amounts or of tax deficiencies.

Accordingly, as the Government submits, there is no factual dispute wherein the jury may consistently find the defendant innocent of the greater and guilty of the lesser-included offense, nor is there a showing that the false or fraudulent statements did not result in a tax deficiency. *United States v. Brown, supra; Sansone v. United States, supra.*

We agree with the Government's contention that the trial judge did not err in refusing to instruct on Title 26, United States Code, Section 7207.

AFFIRMED.