UNITED STATES of America, Appellee,

v.

John Joseph CASWELL, a/k/a Don Dawson, John J. Dawson, Jack Quinn, Richard Quinn, Bill Burns, "Sam," Appellant.

No. 86–2201.

United States Court of Appeals,
Eighth Circuit.

Submitted April 16, 1987.

Decided July 31, 1987.

Rehearing Denied Aug. 24, 1987.

Charles M. Shaw, St. Louis, Mo., for appellant.

Frederick Dana, Asst. U.S. Atty., St. Louis, for appellee.

Before FAGG, Circuit Judge; BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

John Joseph Caswell appeals from a district court[1] judgment entered upon a jury conviction of four counts of income tax evasion. Caswell was found guilty of willfully evading income taxes during the years 1979, 1980, 1981 and 1982, in violation of 26 U.S.C. § 7201. For reversal, Caswell contends that the government failed to meet its burden of proof under three essential elements of the "cash expenditures" method of proving tax evasion, that the district court erred in admitting

into evidence summary charts prepared by a government witness, and that the court erred in other trial and post-trial rulings. We affirm.

## I. BACKGROUND.

During November and December of 1982, IRS agents used pen registers (recording devices) to track telephone calls from an apartment rented by Caswell located in Creve Coeur, Missouri to the Caswell farm in O'Fallon, Missouri. The registers showed that numerous calls were forwarded to the farm, and that during a period of flooding near the farm in early December, calls were switched to Caswell's residence in Chesterfield, Missouri. The registers also showed an increase in calls in late November of 1982, when the NFL football strike ended and play resumed.

After receiving search warrants, the IRS, on December 12, 1982, conducted simultaneous raids on the farm and the Creve Coeur apartment. As a result of an analysis of the pen registers and the evidence seized from the raids, IRS agents concluded that a sports bookmaking operation was and had been in operation on the Caswell farm, and that Caswell was behind the operation. Further investigation revealed that Caswell had been making sports-related bets with various persons for several years.

This information prompted the IRS to investigate Caswell's finances to determine whether he had evaded income taxes by underreporting his income. After an extensive investigation of those finances, the IRS set out to prove through use of the "cash expenditures" method[2] that Caswell

---

1. The Honorable James H. Meredith, United States District Judge for the Eastern District of Missouri.

2. Like the "net worth" and "bank deposits" methods, the "cash expenditures" method is an indirect method of proof designed to uncover unreported income in tax evasion cases where direct methods of proof are unavailing or nonexistent. *See United States v. Abodeely,* 801 F.2d 1020, 1023 (8th Cir.1986) ("bank deposits" tax evasion case). Under the "cash expenditures" method,

after taking into account the amount of resources the taxpayer had on hand at the beginning of a period, the income received by the taxpayer for the same period is compared with his expenditures that are not attributable to his resources on hand or non-taxable receipts during the period. A substantial excess of expenditures over the combination of reported income, non-taxable receipts, and cash on hand may establish the existence of unreported income. [Footnote omitted.]

*United States v. Citron,* 783 F.2d 307, 310 (2d Cir.1986).

had underreported income for the years 1979, 1980, 1981, and 1982.

At trial the government introduced into evidence Caswell's filed tax returns for the years 1975 through 1982. In 1975 and 1976, Caswell filed joint returns with his first wife, Joan. They were divorced in 1977, and Caswell filed individual returns for 1977 and 1978. From 1975 through 1978, Caswell's reported taxable income never exceeded $13,000.

In 1979, Caswell filed a joint return with his second wife, Jean, reporting taxable income of $12,801. In 1980, 1981, and 1982, Caswell filed individual tax returns, reporting taxable income of $17,018, $18,-745, and $18,179, respectively. These figures largely represented Caswell's W–2 income from his job as a truck driver; he did not report any gambling income. Later at trial, the government introduced evidence showing that Caswell's cash expenditures far exceeded his reported income in the years 1979, 1980, 1981, and 1982.

As part of its investigation, the government also examined the financial records and dealings of several of Caswell's close relatives. At trial the government introduced into evidence the tax returns of these relatives, which showed that none of them reported significant amounts of income during the investigative period.[3] As with Caswell, the government later introduced evidence of the relatives' cash expenditures during this period, which showed that like Caswell, they made large cash expenditures far exceeding their reported incomes.

In computing Caswell's tax deficiency under the expenditures method, government witnesses explained that they attributed to Caswell not only his expenditures but also the large cash expenditures of his close relatives. The government did so based on its theory that the only likely source of Caswell's expenditures and those of his relatives was Caswell's income from his gambling activity and bookmaking operation.[4]

3. Appellant's first wife, Joan, subsequently married Frank Williford. They reported taxable income in 1980, 1981, and 1982, respectively, in the amount of $19,375, $15,347, and $10,748, essentially composed of W–2 income. In 1980, 1981, and 1982, Jean, appellant's second wife, filed individual returns showing taxable income of $3,088, $6,576, and $4,089, respectively, mainly from "self-employment" income. Appellant's parents, Joseph H. and Kay T. Caswell reported taxable income in the years 1977 and 1978 of $14,078 and $7,908. Kay died in 1979. Joseph filed individual returns in the years 1979, 1980, 1981, and 1982, respectively, reporting income in the amount of $4,047, $3,118, $2,911, and $7,585, consisting mainly of W–2 and pension income. In 1978, 1981, and 1982, appellant's son, Jack, Jr. or sometimes called John, reported gross income of $2,805, $10,250, and $25,937, respectively, representing mainly W–2 income. In 1979 and 1980, Jack, Jr. and his wife Elaine filed joint returns reporting adjusted gross income of $4,569 and $11,223. Filed tax returns during this period also showed that appellant's other two sons, Tim and Frank, and his daughter, Catherine, reported insignificant amounts of income. Later on at trial, the government introduced evidence showing that appellant's grandfather, Frank Sargent, had only social security income during the years under investigation.

4. In its opening statement at trial, the government explained its theory:

This is a criminal tax evasion case. * * * [This is] an expenditures tax case and the evidence will show that the expenditures of the defendant * * * exceeded his available wage income for the years charged here in the indictment. * * *

\* \* \* \* \* \*

* * * The evidence will further show that the only likely source of cash in this particular case among the defendant and his relatives was [defendant; t]hat [defendant,] in addition to being a Grey Eagle driver with W–2 wage income[,] was a bookmaker * * * and the evidence will show * * * that a bookmaker accepts wagers from other individuals, while betting money on various sports contests, basketball, baseball, football—NFL football in this occasion.

The evidence will * * * show that bookmakers normally deal in currency. The evidence will further show that the defendant and his relatives made significant cash expenditures but did not in any [remote way] have the resources, the income or the job to allow them to do that. They did not have * * the capability to make the currency expenditures that were in this case.

The evidence will show that after a review of each relative's tax returns, bank accounts, Social Security accounts, retirement income, and third party documents, * * * [defendant] was the only likely source of the currency used for the expenditures in this case.

After the presentation of the above evidence, a government summary witness testified that for the years 1979 through 1982, Caswell's expenditures were $84,118, $143,188, $191,655, and $82,228; that under the "cash expenditures" method, his corrected taxable income was $80,803, $130,926, $170,963, and $80,973; and that Caswell therefore had taxes due and owing of $17,039, $47,737, $75,100, and $24,096.

## II. DISCUSSION.

### A. Essential Elements Under the "Cash Expenditures" Method.

Caswell contends that the government failed to establish (1) a likely source of income for the years 1979, 1980, and 1981; (2) his "cash on hand" or "net worth" at the beginning of each year; and (3) the "net worth" of each Caswell relative whose expenditures were attributed to him.

### 1. Likely Source of Income.

Under the "cash expenditures" method of proof, the government is required to show either a "likely source" of the allegedly unreported income or that it has negated all reasonably possible nontaxable sources of income. *United States v. Mastropieri,* 685 F.2d 776, 784–85 (2d Cir.), *cert. denied,* 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 203 (1982); *see United States v. Bianco,* 534 F.2d 501, 506–07 (2d Cir.), *cert. denied,* 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). Caswell admits that the December 1982 gambling raids produced evidence of a "likely source" of income for 1982, and thus, he does not challenge (under this argument) his conviction for that year.[5] Rather, he contends that this evidence could not be used by the jury to make a "quantum leap" and infer that the bookmaking operation was also his "likely source" of income in 1979, 1980, and 1981. Caswell therefore maintains that the three counts corresponding to those years must fail as a matter of law.

The government's response is two-fold. First, relying on *United States v. Heyward,* 729 F.2d 297 (4th Cir.1984), *cert. denied,* 469 U.S. 1105, 105 S.Ct. 776, 83 L.Ed.2d 772 (1985), and *Beard v. United States,* 222 F.2d 84 (4th Cir.), *cert. denied,* 350 U.S. 846, 76 S.Ct. 48, 100 L.Ed. 753 (1955), the government asserts that the evidence from the 1982 gambling raids was admissible to allow the jury to infer that Caswell had a gambling income in the previous three years. In both cases, the Fourth Circuit held that discovery of certain evidence of unreported income in one year did not render the evidence inadmissible to substantiate the government's claims of tax evasion in previous years. *Heyward,* 729 F.2d at 301 (drug laden plane discovered in 1980 admissible to prove defendant's "net worth" in 1978 and 1979); *Beard,* 222 F.2d at 92 (bookmaking evidence found in 1945 relevant to 1944 tax evasion charge). Instead, the time difference was "simply a matter to be considered by the jury." *Heyward,* 729 F.2d at 301 (citing *United States v. Wright,* 667 F.2d 793, 800 (9th Cir.1982)). Second, the government maintains that there was other evidence of Caswell's betting activities in 1979, 1980, and 1981 which allowed the jury to infer that appellant's likely source of income for those years was from gambling.

Although we are inclined to agree with the Fourth Circuit's analysis of the issue, we do not have to reach this question as

---

5. At oral argument, Caswell's counsel conceded that the government established the existence of a bookmaking operation, but then asserted, without any explication, that the government failed to prove that Caswell ran the operation. This claim is without merit.

The district court record shows that the government introduced many pieces of evidence to support its theory that Caswell was behind the operation. For example, there was evidence that (1) Caswell was the lessee of the Creve Coeur apartment from which bets were transferred, (2) calls from the apartment were transferred at one point to Caswell's residence, (3) Caswell (along with his father and son) was present at the Caswell farm when the raid occurred, and (4) IRS agents answering the phone at the farm during the raid received bets from persons who often asked for a "Jack" or "Jackie"—Caswell's nicknames. This is but a brief sample of the evidence introduced by the government. We believe this evidence was more than sufficient to allow the jury to infer that Caswell was behind the bookmaking operation.

the record clearly indicates that the government introduced sufficient other evidence of Caswell's gambling activity in 1979, 1980, and 1981 to show that the likely source of his unreported income was from gambling. For example, there was evidence from which the jury could infer that Caswell acted through the alias "Don Dawson" in purchasing sports information from two different services in 1981. Additionally, Stephen Geist, a convicted gambler, testified that he had made bets with Caswell since 1976. Further, Ivan Mullenix testified that from 1980 through 1982, he rented Caswell, under the alias "Frank or Richard Quinn", the apartment from which bets were transferred to the Caswell farm. Mullenix also testified that he made weekly bets with Caswell on NFL games during 1979 and 1980.

In summary, the evidence of Caswell's bookmaking and gambling was not limited to the year 1982. Accordingly, we hold that the evidence of Caswell's betting activities was sufficient to allow the jury to conclude that this was a "likely source" of Caswell's unreported income for the years 1979, 1980 and 1981.

### 2. Beginning "Net Worth" or "Cash on Hand."

In a "cash expenditures" case, the government must also prove to a reasonable certainty "(i) expenditures during the period in question and (ii) the opening net worth of the taxpayer, including cash on hand." *Citron,* 783 F.2d at 315 (citing *Bianco,* 534 F.2d at 504). In contrast to a tax evasion case prosecuted under the "net worth" method, however, the government need not prepare a formal net worth statement. *Id.* at 315, 316. "Rather, accurate inclusion of diminution of resources serves the function of enabling the jurors to determine if expenditures were financed by liquidation of assets, depletion of a cash hoard, or unreported income." *Id.* at 315 (citation omitted); *see Taglianetti v. Unit-*

*ed States,* 398 F.2d 558, 565 (1st Cir.1968), *aff'd,* 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969).[6]

The government has this burden whether it is prosecuting an individual for tax evasion for one year or successive years. In the latter case, however, the government has the duty only to establish the opening cash on hand balance for the beginning year; the income received less disbursements paid during that year will establish the opening funds for the next year, and so on. *United States v. Marshall,* 557 F.2d 527, 530 (5th Cir.1977). Furthermore, when an individual is charged with tax evasion in successive years, the government has the added responsibility of showing dimunition of resources for *each* year under investigation in order to prove that the expenditures in each year were not made from other nontaxable sources of income such as gifts, loans, or bequests. *Id.*

Caswell contends that the government failed to meet this burden because it did not present any "solid" evidence of his cash on hand or diminution of resources for the years under investigation. A close examination of the record in view of the applicable law convinces us otherwise.

In *Taglianetti,* 398 F.2d 558, the government prosecuted the defendant for successive years of tax evasion, basing its case on the "cash expenditures" method of proof. There, the First Circuit held that the government's evidence at trial "was sufficient to allow the jury an intelligent determination of the single relevant issue: whether any expenditures found to be in excess of reported income can be accounted for by assets available at the outset of the prosecution period or non-taxable receipts during the period." *Taglianetti,* 398 F.2d at 565–66 (citing *United States v. Johnson,* 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943)). Although the government did not inform the jury of the dollar value of the defendant's assets comprising his opening

---

**6.** Although courts sometime blur the distinction between the "net worth" and "cash expenditures" methods of proof, the expenditures method is a variant of the "net worth" method, *e.g., Citron,* 783 F.2d at 310, and encompasses differ-

ent elements of proof. *See Taglianetti,* 398 F.2d at 562–63. One example of these differing elements is the requirement related to the presentation of the defendant's net worth.

net worth, the government did present evidence of his opening cash on hand and assets acquired or disposed of during the years in question. *Id.* at 565.

Similarly, the government here, while not presenting formal net worth statements, did inform the jury of the currency available to Caswell at the beginning of each year.[7] Through the testimony of IRS Agent Fox, the government also informed the jury of Caswell's non-liquid assets, such as automobiles, which were either bought or sold during the years in question. Finally, Fox testified that the government's extensive investigation of bank records, prior years' tax returns, and the like revealed no other possible nontaxable sources of income, other than a cash gift that it included in Caswell's opening cash balance, to explain Caswell's large cash expenditures during the period under investigation. We believe that this evidence, strikingly similar to the type found sufficient in *Taglianetti,* was sufficient to prove Caswell's "net worth" and "cash on hand" and to allow the jury to infer that there were no other possible sources of income to explain Caswell's expenditures.

Further, although Caswell asserts that this evidence was insufficient, he did not introduce any evidence to rebut the government's findings in this area.[8] It is well-settled that "once the government has introduced evidence from which the jury could conclude with reasonable certainty that no [nontaxable] assets existed, the defendant remains silent at his own peril." *Bianco,* 534 F.2d at 506 (citing, among other cases, *Holland v. United States,* 348 U.S. 121, 138–39, 75 S.Ct. 127, 136–37, 99 L.Ed. 150 (1954)).

### 3. "Cash on Hand" or "Net Worth" for Each Relative.

Caswell further contends that the government failed to establish that he was

the "only likely source" of cash for his relatives' expenditures, and thus, that the government's attribution to him of those expenditures in computing his tax deficiency must be deemed error as a matter of law. In a case like this, where the government has not alleged nor proven the existence of a conspiratorial or agency relationship, Caswell maintains that the only way he can be held liable for his relatives' expenditures is if the government establishes the "net worth" and "cash on hand" balance for each relative. He asserts that this is the only way the government can prove that the relatives had no other possible nontaxable sources of income for their expenditures other than himself.

Before analyzing this contention, it is essential to a full understanding of this case to point out the basic assumption the government impliedly relied upon in attributing to Caswell the large cash expenditures of his relatives—the basic principle of income tax law that income is taxed to the person who earns it, regardless of attempts to divert the income elsewhere. *Lucas v. Earl,* 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930). Because its investigation revealed that Caswell's relatives' expenditures far exceeded their reported incomes and further revealed that none of them had any possible nontaxable sources of income to explain their expenditures, the government theorized that the unreported income was derived from Caswell's gambling activities, and thus, under the principle just enunciated, he was the one responsible for the taxes due and owing. Moreover, because it was *Caswell's* income that was purportedly being diverted, the government obviously could not have proceeded against each or any of the relatives for tax evasion. Thus, the government indicted

---

**7.** IRS Agent Grass testified that he calculated the currency available to Caswell for the years 1979, 1980, 1981, and 1982 as $9,004, $20,619, $17,450, and $3,378, respectively. For each year, Grass prepared an exhibit showing these totals and the component parts of the totals.

**8.** Although there was some evidence of a "cash hoard" and a "death-bed gift", this evidence was

brought in by Caswell's relatives in an attempt to show that *they* had other possible sources of nontaxable income. Rather than address this defense here, we believe it is more logical to address it under Caswell's next contention, which specifically relates to the problems of proof associated with attributing to him his relatives' expenditures.

only Caswell for willfully evading taxes in violation of 26 U.S.C. § 7201.

With this in mind, it becomes apparent that Caswell's contention that the government must show the "net worth" of each relative is actually an assault on the sufficiency of the government's evidence in this case. This conclusion finds support in many other tax evasion cases where courts have held a defendant liable for the expenditures of others, despite the absence of a conspiracy charge. *E.g., United States v. Tempesta,* 587 F.2d 931, 933 (8th Cir. 1978) (father's expenditure attributed to defendant-son), *cert. denied,* 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380 (1979); *United States v. Giacalone,* 574 F.2d 328, 333 (6th Cir.) (wife's expenditures treated as made with defendant-husband's money), *cert. denied,* 439 U.S. 834, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978); *Marshall,* 557 F.2d at 531 (capital contributions made by partner to partnership attributed to defendant-partner); *Taglianetti,* 398 F.2d at 567 (brother-in-law and wife's expenditures may be attributed to defendant); *see Citron,* 783 F.2d at 318 (jury entitled to conclude that stock in parent's account and income derived therefrom belonged to defendant-son); *United States v. Pack,* 773 F.2d 261, 264 (10th Cir.1985) (defendant attempted to conceal income by placing ownership titles of purchases in names of others). These cases indicate that the real question is whether the government introduced sufficient evidence to allow the jury to infer that the other individual's expenditures were made with the defendant's income. *See, e.g., Tempesta,* 587 F.2d at 933.[9] Thus, the specific question becomes: what amount of evidence is sufficient?

 Our examination of the relevant cases convinces us that the government is not required to establish the other individual's "net worth" or "cash on hand" as if that person was under investigation. Rather, the government can meet its burden of proof if it conducts a reasonable investigation into the finances of those individuals and introduces evidence to negate the possibility that the income came from a source other than the defendant. *See id.; see also United States v. Grasso,* 629 F.2d 805, 807 (2d Cir.1980) (per curiam) (under "net worth" theory, government must separate spouses' finances to justify inference that wife's expenditures made with husband's funds). To meet this burden, we believe the government is obligated to show that it has investigated all leads provided by the defendant into other possible sources of nontaxable income such as gifts, inheritances, or cash hoards. *See Bianco,* 534 F.2d at 506. After a careful review of the evidence presented in this case, we believe that the government met this burden.

The IRS agents, as a part of their investigation of the Caswell family finances, subpoenaed and examined numerous cashier checks, statements, and other documents from banks, savings and loan institutions, and commercial lending institutions, in addition to examining court records. This investigation revealed that Caswell's relatives made several large cash expenditures during the years under investigation. At trial, the government introduced this evidence along with the tax returns of these relatives to show that none of them had the reported incomes to account for the expenditures. In addition, the government's investigation turned up no inheritances, gifts, cash hoards, or other sources of nontaxable income to explain the expenditures. We believe that this evidence, along with that of Caswell's gambling income, was sufficient to allow the jury to conclude that Caswell was the only likely source of his

---

**9.** In his brief, Caswell also contended that the government failed to state a cause of action in its opening statement and that the evidence presented at trial was a material variance from the indictment. Similar to the "net worth" argument, he claimed that the only basis for holding him liable for his relatives' expenditures would have been if the government showed, under an agency or conspiracy cause of action, that the relatives made the expenditures for or on behalf of Caswell. Because the government presented no direct evidence linking him to those expenditures, he claimed that the government's case failed as a matter of law. In view of the above analysis, however, it is clear that these two contentions, like Caswell's "net worth" contention, are assaults on the sufficiency of the government's evidence. Accordingly, our above examination of the issue implicitly subsumes these other two arguments.

relatives' large cash expenditures during 1979, 1980, 1981, and 1982, and that Caswell gave them these funds or opened accounts in their names in order to conceal his illegally-unreported income.

Moreover, although there was some evidence of a $40,000 "cash hoard" found by Caswell's grandfather in 1984 after his wife died, and a $30,000 "death bed gift" given to Caswell's first wife by his mother in 1979 while she was in the hospital just before her death, the jury was fully justified in disregarding these alleged funds as other possible sources of income. First, the government's extensive investigation and discussions with the Caswell family did not uncover these sources. In fact, they were apparently made known to the government only shortly before trial commenced. *Cf. Bianco,* 534 F.2d at 506 (*post hoc* suggestions of other possible nontaxable sources of income do not render government's search insufficient). Second, the alleged "cash hoard" was found in *1984.* This by itself does not explain the cash expenditures made in 1979, 1980, 1981, and 1982, and indeed, there was no evidence showing that the hoard existed during this time. Under these circumstances, and in light of the fact that the persons testifying to the funds were Caswell's own relatives, we hold that the jury was "under no duty to accord face value to this self-serving, undocumented testimony." *United States v. Goldstein,* 685 F.2d 179, 182 (7th Cir. 1982).

**B. Introduction into Evidence of Summary Charts.**

Caswell next contends that the district court erred in allowing into evidence the summary charts prepared and testified to by IRS Agent Grass. Caswell asserts that the charts were not tied to specific items of evidence and were not fair summaries of the evidence. Accordingly, relying heavily on *Citron,* 783 F.2d 307, he maintains that a new trial must be granted.

In *United States v. King,* 616 F.2d 1034 (8th Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 829 (1980), we held that a summary witness' testimony may be received as long as that testimony is based on the evidence in the case and the witness is available for cross-examination. *Id.* at 1041 (citing *United States v. Esser,* 520 F.2d 213 (7th Cir.1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976)). Additionally, we stated that the use of summary charts is proper where the charts aid in understanding the testimony already introduced and the preparing witness is subject to cross-examination with all documents used to prepare the summary. *Id.* (citing *Gordon v. United States,* 438 F.2d 858 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971)). Finally, we noted that the evidentiary use of summary charts rests with the sound discretion of the trial judge. *Id.* (citing *United States v. Smallwood,* 443 F.2d 535, 540 (8th Cir.), *cert. denied,* 404 U.S. 853, 92 S.Ct. 95, 30 L.Ed.2d 93 (1971)).

Agent Grass, an accountant and the government's summary witness in this case, has had specialized training in tax matters and has testified as an expert witness in many tax cases. He testified that the summary charts were based on the testimony offered at trial, the documents and exhibits presented to the court, and the stipulations of counsel. Further, he explained the mechanics of the expenditures method and how he used the method in making his calculations. He then testified as to the exhibits representing Caswell's expenditures (Exhibits 469–472), currency available (Exhibits 473–476), and business expenses (Exhibit 477) for each year under investigation. For each exhibit, he explained that the totals were made up of the listed component parts, which were referenced to documents presented by the government. He further testified as to the summary charts denoting the excess expenditures over funds available—equalling unreported income. Grass stated that he used these charts to compute Caswell's corrected taxable income and tax deficiency for each year.

We believe this method of explaining and offering into evidence summary charts fully complies with the standards outlined in *King,* and that the district court did not abuse its discretion in allowing them into

evidence. Caswell's counsel had full opportunity to and did cross-examine Grass, testimony which the jury was entitled to weigh in making its determination as to the accuracy of the numbers.

Additionally, *Citron* is inapposite to the case at bar. There, the Second Circuit held that the government's summary chart of the defendant's cash on hand was improperly admitted because the government did not lay a proper foundation. *Citron*, 783 F.2d at 316–17. Specifically, the court noted that the government failed to explain either through testimony or otherwise how the totals listed on the chart were calculated from the exhibits cross-referenced on the chart. *Id.* In marked contrast, here, Agents Fox and Grass both testified about the expenditures method and the relevant expenditures in this case. Moreover, Grass testified about the specific expenditures used in his calculations, noting that they were cross-referenced on the exhibits. He further explained how the expenditures figured into the totals for each year. Thus, the government clearly laid a proper foundation, through the testimony of both Fox and Grass, for admission of the charts into evidence.

### C. Other Trial and Post-Trial Rulings.

Caswell's other contentions do not detain us long.

First, Caswell contends that the district court erred in failing to conditionally receive certain disputed evidence and in allowing Agents Fox and Grass to opine on ultimate issues. As to the former contention, the record supports Caswell's point that the district court initially had some questions on the relevancy of the evidence of Caswell's gambling and the relatives' expenditures, as evidenced by its admonition to the government at one point in the trial to "connect it up." After receiving citations of "cash expenditures" cases and further testimony, however, the court later denied Caswell's motions for a directed verdict and acquittal. We believe this clearly indicates that the court received the disputed evidence conditionally, until such time as it had to rule on the matter.

Similarly, Caswell's challenge under Fed.R.Evid. 704 to the testimony of Agents Grass and Fox is unavailing. Both were qualified as experts on tax evasion matters and had substantial experience with the "cash expenditures" method of proof. They did not give opinions on ultimate issues of the case, but explained the expenditures method and made conclusions under the method based on the evidence in the case. Clearly, there was no violation of Rule 704.

Second, Caswell contends that the court erred in refusing his proffered jury instruction which would have allowed the jury to consider lesser included offenses under 26 U.S.C. §§ 7206 and 7207. Under the facts of this case, however, the court properly denied the instructions. *See Sansone v. United States*, 380 U.S. 343, 349–50, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965); *accord King*, 616 F.2d at 1042–43.

Finally, Caswell contends that the district court erred in not directing a mistrial when, on re-cross, the government asked Agent Fox whether Caswell granted an interview to IRS agents. Although Caswell argues that his fifth amendment right to remain silent was violated, it is clear that this claim is groundless. The question was not directed at Caswell's absence from testifying at trial, but was asked after his counsel, on cross-examination, asked questions of Fox which implied that the government had not exhausted all of its investigative leads. Clearly, this is not a situation necessitating reversal.

### III. CONCLUSION.

Based on the foregoing analysis, we affirm Caswell's conviction of tax evasion under 26 U.S.C. § 7201 on all four counts.