**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Christos KARRAS, d/b/a Time Out Steakhouse and Restaurant, Defendant and Appellant.**

**No. 15883.**

Supreme Court of South Dakota.

Argued May 25, 1988.

Reassigned Jan. 11, 1989.

Decided March 22, 1989.

Rehearing Denied April 27, 1989.

John P. Dewell, Asst. Atty. Gen., Pierre, and Donald N. Srstka, Sp. Asst. Atty. Gen., Sioux Falls, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on the brief.

William P. Fuller of Woods, Fuller, Shultz & Smith, P.C., Sioux Falls, for defendant and appellant.

MILLER, Justice (on reassignment).

In this appeal we affirm a conviction on six counts of sales tax evasion and hold (1) that the trial court did not err in admitting certain summary charts and (2) that the jury instructions did not shift State's burden of proof to the defendant.

Appellant Christos Karras (Karras) was indicted by a Minnehaha County Grand Jury on two misdemeanor counts and four felony counts of making false and fraudulent tax returns to evade state sales tax.[1] These counts involved misreporting of sales at Karras' restaurant, the Time Out Steakhouse, during six two-month periods in 1984. After a jury trial, Karras was found guilty on all six counts and was sentenced to four consecutive one-year terms (one for each felony count) in the state penitentiary and six months in the Minnehaha County Jail for the two misdemeanor counts. His misdemeanor sentence was to run concurrently with the felony sentences. In addition, Karras was ordered to pay $40,336.44 ($24,359.44 in costs of prosecution, $11,668.00 in unpaid sales tax for 1984, and $4,309.00 for 1987 sales taxes). All but sixty days of Karras' sentence was to be suspended if he paid the $40,336.44, plus interest, within six months of entry of judgment. This appeal followed.

---

1. SDCL 10–45–50, which provided that making a false or fraudulent tax return to evade sales tax was a Class 1 misdemeanor, was repealed. 1984 S.D.Sess.L. ch. 86, § 5. SDCL 10–45–48.1, enacted through 1984 S.D.Sess.L. ch. 86, § 1, upgraded the crime to felony status.

## FACTS

Karras operated the Time Out Steakhouse from 1975 until 1985. In 1982, agents of the South Dakota Department of Revenue (Department) observed that many meal transactions were not rung up on the cash register. The same pattern was observed by Department agents in 1984. Although Karras was advised by agents to keep register tapes, customer tickets and sales journals, he failed to maintain such records. Instead, Karras had his accountant rely on deposits made into his business checking account.

Department decided to investigate Karras' operation to determine if he was accurately reporting his sales for sales tax purposes. Former employees indicated that their wages were paid partly by check and partly by cash. Cash disbursements were not reported for income tax purposes and tax and other items were not withheld on those payments, unlike payments made by check. These cash payments notwithstanding, Karras informed Department and his own accountant that all sales proceeds were deposited into his business checking account. Department doubted Karras' claim.

Philip Sieler (Sieler), a Department agent, determined that large amounts of gross sales receipts were not reported by Karras, resulting in underpayment of sales taxes. Sieler used two separate approaches: 1) A "percentage" method, by which gross receipts were calculated using the amount of goods purchased by Karras in each tax reporting period, menu prices, wastage, and estimated costs of goods sold, the result of which indicated $199,000 in unreported gross sales; and 2) a "bank deposit" method, by which an analysis of Karras' deposits, transfers and withdrawals from all bank accounts revealed $112,000 of income which could not be traced to a source.

Sieler testified concerning his methods and results. A certified public accountant (CPA), testifying for State, verified that Sieler's procedures were sound. State's CPA, using a "sources and uses" method, estimated that Karras had used approximately $110,000 in unidentified funds in 1984. This CPA also performed a "net worth" analysis, which uncovered an unexplained $138,000 increase in Karras' assets in 1984.

State's estimates were disputed by Karras, who produced, among others, a CPA as a defense witness. This CPA, however, testified that even he could not account for $49,000 of Karras' funds.

## DECISION

### I

### ADMISSION OF SUMMARY CHARTS

Karras argues that he was denied due process of law when the trial court admitted summary charts prepared by the State into evidence. He asserts that the charts were misleading or unsupported by the evidence. Karras suggests that since no cautionary instruction was given to inform the jury that the charts were, in themselves, not evidence, he was convicted in a "trial by chart."

State introduced charts regarding both the bank deposit and percentage methods of analysis. The charts were received in evidence and taken into the jury room. Karras argues that the bank deposit charts were misleading because 1) cash payments of $28,569 to kitchen employees were not supported by the evidence, and 2) Sieler had counted transactions involving $10,500 in certificates of deposit and $4,000 in loans twice. We disagree.

Sieler's estimates of cash payments to kitchen employees were based on detailed testimony of four of the employees, including Vien Nguyen, Karras' former kitchen manager. Nguyen testified that 60% of his pay was made by cash and that the others in the kitchen were also paid partly in cash. Three other employees testified that half of their pay was in cash. Sieler's extrapolation that 35% of the kitchen payroll was made by cash was, if anything, conservative, based on this record.

We also reject Karras' arguments that charts illustrating the "percentage" method were unsupported by evidence or lack-

ing in foundation. Testimony by Sieler and restaurant owner George Christopoulos concerning percentages of waste and cost of goods was challenged by Karras, but this only created questions for the jury to decide.

■ Karras next complains that Exhibits 134 and 135 were improperly admitted. Karras claims that Exhibit 134 was never explained and was offered with Exhibit 135. The record indicates that these two exhibits were explained together. Exhibit 134 contained five sets of numbers: 1) Goods Purchased; 2) Average Cost of Goods; 3) Gross Receipts; 4) Under-reported Sales; and 5) Percent of Under-reporting. The first four items were explained in reference to Exhibit 135. The fifth, Percent of Under-reporting, was not. This is not enough to render Exhibit 134 inadmissible. Calculation of percentages is not an arcane mathematical concept and not every government calculation need be described in detail. *See United States v. Citron*, 783 F.2d 307 (2d Cir.1986). In addition, the analysis used in Exhibit 134 was clarified in jury instruction 12A. Evidentiary use of summary charts rests within the sound discretion of the trial court. *United States v. Caswell*, 825 F.2d 1228 (8th Cir.1987); *United States v. King*, 616 F.2d 1034 (8th Cir.1980). We find no abuse of discretion in admitting these exhibits.

■ We next find that the allegation of double counting was a matter of conflicting expert testimony. Sieler and State's CPA, Brian Stuart, stood by their figures and Karras' CPA disagreed. The jury determines the accuracy of the numbers. *Caswell, supra.* Further, a claim of inaccuracy does not make summary charts inadmissible where the trial court is satisfied that the summaries are reasonably accurate and there is evidence to support them. *King, supra.*

We conclude Karras' argument that he was prejudiced by the trial court's failure to give a cautionary instruction concerning the charts has not been preserved for appeal. At trial, he merely objected to the exhibits on foundational grounds and never requested or offered a proposed cautionary

or guarding instruction. Similarly, on appeal, the issue was only given trivial, token argument.

■ We conclude further that the failure to give a cautionary instruction, especially when reading all of the other instructions as a whole, does not rise to the level of plain error. *State v. Dornbusch*, 384 N.W.2d 682 (S.D.1986); *State v. Sheridan*, 383 N.W.2d 865 (S.D.1986); *State v. Bunnell*, 324 N.W.2d 418 (S.D.1982); *State v. Brammer*, 304 N.W.2d 111 (S.D.1981).

## II

### JURY INSTRUCTIONS

■ Karras next claims that jury instructions 12A and 12B, defining the "percentage" and "bank deposit" methods of analysis, switched the burden of proof to him, requiring that he prove his innocence. Karras specifically challenges the following sections of these lengthy instructions:

Instruction 12A:

*   *   *   *   *   *

If you decide that the evidence in the case establishes beyond a reasonable doubt that the State has accurately determined the underlying supporting data in a reasonable and reliable manner, then you may determine that the State computed the gross sales properly for each required reporting tax sales reporting period. In reaching this decision, you may consider other evidence offered by the State which may corroborate sales in excess of those which were reported by the defendant, such as unexplained deposits, cash payment, and other indications of unreported funds.

Instruction 12B:

*   *   *   *   *   *

This method of proof proceeds on the basis that if a taxpayer is engaged in an income producing business or occupation and periodically deposits money in bank accounts in his name or under his control, an inference arises that such bank deposits represent taxable gross receipts that defendant received from his business unless it appears that the deposits

represented redeposits or transfers of funds between accounts, or that deposits came from non sales taxable sources such as proceeds from sales of real estate, rental and interest income, proceeds from the sale of stock and stock dividends, profits or draws from the business, gifts, inheritances or loans. This method also contemplates that any expenditures by the [defendant] of cash or currency from funds not deposited in any bank and not derived from the non sales taxable sources referenced above, similarly raises [an] inference that such cash or currency represents taxable gross receipts that defendant derived from his business.

\* \* \* \* \* \*

In determining whether or not the claimed cash-on-hand of the defendant at the starting point is reasonably accurate, you may consider whether State agents sufficiently investigated all reasonable "leads" suggested to them by the defendant, or which otherwise surfaced during the investigation concerning the existence of other funds at that time. If you should find that the State's investigation has either failed to reasonably pursue, or to refute, plausible explanations which were advanced by the defendant, or which otherwise arose during the investigations, concerning the defendant's cash-on-hand at the starting point, then you should find the defendant not guilty. Notice, however, that this duty to reasonably investigate applies only to suggestions or explanations made by the defendant, or to reasonable leads which otherwise turn up; the State is not required to investigate every conceivable source of nontaxable funds.

. . . .

In conjunction with arguing that these instructions were improper, Karras believes that his own proposed instruction, to the effect that the State was required to prove that any unexplained funds came from his business, was erroneously rejected by the trial court. These arguments are unsound.

The Supreme Court in *Holland v. United States*, 348 U.S. 121, 137–39, 75 S.Ct. 127, 136–37, 99 L.Ed. 150, 165–66 (1954), stated:

But petitioners claim the Government failed to adduce adequate proof because it did not negative all the possible nontaxable sources of the alleged net worth increases—gifts, loans, inheritances, etc. We cannot agree. The Government's proof, in our view, carried with it the negations the petitioners urge. Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient.... [H]ere, the disclosed business of the petitioners was proven to be capable of producing much more income than was reported and in a quantity sufficient to account for the net worth increases. Any other rule would burden the Government with investigating the many possible nontaxable sources of income, each of which is as unlikely as it is difficult to disprove. This is not to say that the Government may disregard explanations of the defendant reasonably susceptible of being checked. But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant....

*The Burden of Proof Remains on the Government.*

Nor does this rule shift the burden of proof. The Government must still prove every element of the offense beyond a reasonable doubt though not to a mathematical certainty. The settled standards of the criminal law are applicable to net worth cases just as to prosecutions for other crimes. Once the Government has established its case, the defendant remains quiet at his peril.... The practical disadvantages to the taxpayer are lessened by the pressures on the Government to check and negate relevant leads. (Citations omitted.)

Instructions 12A and 12B were consistent with *Holland*. State's evidence indicated the existence of large amounts of

unidentifiable funds. Direct testimony from four employees revealed that Karras operated his restaurant partly on a cash basis. This, combined with Karras' failure to keep detailed records (*see* SDCL 10–45–45), supported the inference that the restaurant was the "likely source" of unexplained funds referenced in *Holland,* quoted above. As noted in *Holland,* we cannot allow skillful concealment to become an invincible barrier to proof.

Because there was no unconstitutional shifting of the burden of proof, we reject Karras' arguments that instructions 12A and 12B were improper and that rejection of Karras' proposed instruction was erroneous.

We have considered Karras' other issues (that there was insufficient evidence to support the verdicts and that denial of his pretrial discovery motion deprived him of due process of law) and find them to be totally lacking in merit.

Affirmed.

WUEST, C.J., and MORGAN, J., concur.

HENDERSON and SABERS, JJ., concur in part and dissent in part.

HENDERSON, Justice (concurring in part, dissenting in part).

I agree with the majority opinion in all respects save one: Reversal is warranted because the jury was not instructed that the State's charts were not, in themselves, evidence.

As the majority notes, cautionary instructions regarding the charts were not requested below, and none were given. Our consideration of this matter should not end there, however. Under SDCL 23A–44–15, this Court may recognize plain errors affecting substantial rights even when such errors are not brought to the attention of a court. *See State v. Brammer,* 304 N.W.2d 111, 114 (S.D.1981). This Court may notice, on appeal, defects affecting substantial rights although a defendant fails to properly preserve such defects for appeal. *State v. Bunnell,* 324 N.W.2d 418, 420–21 (S.D.1982). The magnitude of the error in failing to instruct the jury was grave, as the United States Supreme Court has unanimously observed:

> There is *great danger* that the jury may assume that once the Government has established the figures in its net worth computations, the crime of tax evasion automatically follows. The possibility of this increases where the jury, without guarding instructions, is allowed to take into the jury room the various charts summarizing the computations; bare figures have a way of acquiring an existence of their own, independent of the evidence which gave rise to them.

*Holland v. United States,* 348 U.S. 121, 127–28, 75 S.Ct. 127, 131, 99 L.Ed. 150, 160 (1954) (emphasis supplied). Guarding instructions that charts are not evidence also serve to neutralize prejudicial effects of conclusory headings on summary charts, a problem vividly at hand where conclusory headings demonstrated that Karras underreported sales. This was the crux of the State's case. *See United States v. Stephens,* 779 F.2d 232, 239 (5th Cir.1985). "Under Reported Sales" and "Percent of Under Reporting" were column headings on Exhibits 134 and 135. Also, Exhibit 143 included "Funds from Unknown/Illegal Sources." Such captions were disapproved in *Lloyd v. United States,* 226 F.2d 9, 17 (5th Cir.1955). Use of these captions added to the already great danger inherent in the use of charts.

The majority holds that, when viewed as a whole, the jury instructions were adequate. This is unsound. It is true that Instruction No. 12A directed the jury to determine the reliability of the State's figures regarding costs of goods sold, percentage, average costs of raw products, and menu prices; however, summary charts were never mentioned. How can a cautionary instruction on charts be read into instructions which do not mention charts? Karras is thus engulfed in a morass of generalities of law. Students of the law may easily be confused or misled in generalizations rather than in specific observations. Specific observations can be tested and weighed and meditated upon. In the

enclosure of a particularity, out comes the honey from the beehive. The general holding that instructions when read as a whole may adequately inform the jury, is inapposite here. It's more beehive than honey. Particularity is lost. As the above-quoted passage in *Holland* indicates, the danger of summary charts is that they reinforce and magnify the validity of government data and calculations as if the charts themselves were additional evidence. The jury instructions, although stressing reliability, did not address the separate problem presented by charts. This zeroes in on Karras' poignant advocacy that he had a "trial by chart." I agree.

In summation, although these charts might have been admissible as summaries of the State's position if guarding instructions were used, I would hold that failure to give such instructions was plain error under *Holland.*

SABERS, Justice (concurring in part and dissenting in part).

I agree with the majority that jury Instruction 12A defining the "percentage" method of analysis, did not switch the burden of proof to Karras. However, Instruction 12B, defining the "bank deposit" method of analysis, switched the burden of proof to Karras and improperly required him to prove his innocence. Instruction 12B created a mandatory inference in violation of provisions of South Dakota law and the state and federal constitutions.

A simple comparison of Instruction 12B with Instruction 12A demonstrates the error.

Instruction 12A contains permissive language: "... then you *may* determine ... 'you *may* consider'...." (emphasis added). In contrast, the language of Instruction 12B is mandatory: "... an inference arises ... [and] ... similarly raises [an] inference...." Instruction 12B would have been proper if the key language had stated an inference "may" arise and similarly "may" raise an inference.

The net effect of the court's instruction was a mandatory inference that all deposits in defendant's bank accounts and all cash payments represent taxable gross receipts. This shifted the burden of proof to the defendant and provided the State with a presumption or inference to satisfy the State's burden of proof. The jury could conclude that even though the Time Out Restaurant could not generate the gross sales as charged by the State, consideration of cash payments or unexplained deposits authorized the jury to conclude that such sales were made. This was improper. It cannot be over emphasized that the inference was mandatory. The jury was not instructed that it *may* infer that such bank deposits or such cash payments represent taxable gross receipts. The instruction did not read that cash payments *may* raise an inference. The instruction directed the jury to infer in a mandatory sense that such evidence (cash payments or deposits into bank accounts) represented taxable gross receipts from the defendant's business.

This injustice was magnified by the court's refusal to give the defendant's proposed Instruction #16 which read as follows:

If the State has proven beyond a reasonable doubt the existence of an unidentified source of money, but failed to prove that such money came from the business, you must find the defendant not guilty.

Article VI, §§ 2 and 9 of the South Dakota Constitution protects Karras from being obligated to come forward with proof as to the source of cash deposits and perhaps incriminate himself in so doing. *Cf., State v. Jones,* 406 N.W.2d 366 (S.D.1987) (it is settled criminal law in this state that the "burden of proof" rests upon the prosecution at every stage of the trial); *State v. Devine,* 372 N.W.2d 132 (S.D.1985) (the burden of proof was shifted to the defendant jeopardizing his due process rights and undermining his protection against self-incrimination in violation of art. VI, §§ 2 and 9).

The majority opinion relies heavily on *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). This reliance is misplaced because of the essential difference between this case and *Holland. Holland* was a federal income tax evasion

case. In a federal income tax evasion case, any and all income is subject to tax liability. In a state sales tax evasion case only income generated by or arising from the business in question is subject to tax liability. By necessity, the State must prove that the business was capable of generating the unreported sales. If the State was unable to prove that Karras' business did in fact generate the unreported sales, then the defendant should be acquitted. It is of no consequence if the defendant has additional legal or illegal sources of income independent of the business as long as all sales from the subject business have been reported to the State. If the business did not generate the sales, other sources of income cannot convict the defendant in a sales tax case.

In *Holland*, the Supreme Court concluded that the government proved the defendant's business was capable of producing more income than was reported and in an amount sufficient to account for the increase in net worth. *Id.*, 348 U.S. at 138, 75 S.Ct. at 137. For that reason, the Court concluded that the government did not have to negate all the possible sources of non-taxable income. Here, the jury was instructed that the cash payments and unexplained income were assumed to be attributable to Karras' business. The unexplained income, by itself, was assumed to be attributable to the defendant's business. Under these instructions, there was no need for the State to prove that the business was capable of producing more sales than reported. *Holland* cannot be used to permit this.

Not only constitutional law but statutory law as well requires that such an instruction be framed in a permissive context. The jury may regard the basic facts as sufficient evidence of the presumed fact but cannot be required to do so. SDCL 19–11–4 mandates:

> Whenever the existence of a presumed fact against the accused is submitted to the jury, the court shall instruct the jury that it may regard the basic facts as sufficient evidence of the presumed fact but is not required to do so. In addition, if the presumed fact establishes guilt or is an element of the offense or negatives a defense, the court shall instruct the jury that its existence, on all the evidence, must be proved beyond a reasonable doubt.

Under Instruction 12B, the jury was given no choice but to infer that the deposits and cash payments represented taxable gross receipts. This directly contravened SDCL 19–11–4 and the defendant's right to due process guaranteed by the South Dakota Constitution.

In *State v. Traversie*, 387 N.W.2d 2 (S.D. 1986), the court affirmed a conviction because the instruction created a permissive inference as opposed to a mandatory presumption. A mandatory presumption, whether conclusive or rebuttable, would be constitutionally infirm if it relieved the state of the burden of persuasion on an element of the offense. *Id.* In *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), the Supreme Court stated:

> A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion. (footnote omitted).

*Id.*, 471 U.S. at 314, 105 S.Ct. at 1971. The fact that the presumption may be rebutted does not save the instruction. "A mandatory rebuttable presumption is perhaps less onerous from the defendant's perspective, but it is no less unconstitutional." *Id.*, 471 U.S. at 317, 105 S.Ct. at 1972. This position is consistent with *State v. McDonald*, 421 N.W.2d 492 (S.D.1988), which held that an instruction concerning presumptions that the driver was under the influence was defective where the instruction failed to include an admonition that the state must prove the basic fact presumed beyond a reasonable doubt.

Accordingly, I would reverse and remand for a fair trial on proper jury instructions in accordance with this writing.